**VALOT et al., Appellants,**

v.

**SOUTHEAST LOCAL SCHOOL DISTRICT BOARD
OF EDUCATION et al., Appellees.**

[Cite as *Valot v. Southeast Local School Dist. Bd. of Edn.* (1997), 124 Ohio App.3d 492.]

Court of Appeals of Ohio,
Eleventh District, Portage County.

No. 96–P–0280.

Decided Dec. 15, 1997.

*Barry Laine* and *Ira J. Mirkin,* for appellants.

*Daniel D. Mason, Michael J. Loughman* and *David K. Smith; G. Frederick Compton, Jr.,* for appellees.

---

CACIOPPO, Judge.

This case is an appeal from a summary judgment entered by the Portage County Court of Common Pleas in favor of the Southeast Local School District Board of Education ("School Board") and members of the School Board, defendants below and appellees herein, and against Sally Ann Valot, Jean Hansen, and Anna D. Roosa, plaintiffs below and appellants herein.

Appellants assign the following error:

"The trial court erred by overruling plaintiffs' motion for summary judgment, granting defendants' motion for summary judgment, and dismissing plaintiffs' complaint."

■ We apply the same standard used by the trial court in reviewing a trial court's entry of summary judgment. *Cooperider v. Peterseim* (1995), 103 Ohio

App.3d 476, 478, 659 N.E.2d 882, 883–884. Civ.R. 56(C) specifically provides that before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to the party. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 471–472, 364 N.E.2d 267, 273–274.

The parties stipulated to the statement of facts set forth in *Valot v. Southeast Local School Dist. Bd. of Edn.* (N.D.Ohio 1995), 957 F.Supp. 991, 993–994.

The parties agreed that the following material facts in this case were not in dispute:

"Prior to the summer of 1993, * * * [appellants], Valot, Hansen and Roosa, all served as substitute school bus drivers for the School Board for three or more years. * * * [Appellants] were employed pursuant to consecutive nine-month contracts, tendered to them by the School Board at the beginning of each school year. * * * [Appellants] were not employed during the summer months.

"As a matter of practice, the School Board voted at the end of each school year not to automatically renew its substitute bus drivers' contracts. Instead, the School Board informed its substitute bus drivers that if they wished to work as bus drivers during the next school year, they should notify their supervisor. Their supervisor would relay this information to the school Superintendent, [Terry P. Byers ("Byers") of the Southeast School System] who would make recommendations to the School Board. The School Board would then vote on whether it desired to tender contracts to those substitute bus drivers whom * * * [Byers] recommended. The School Board virtually always accepted * * * [Byers's] recommendations.

"Each year before the 1993–94 school year, all * * * [appellants] consistently: (1) notified their supervisor that they wished to be rehired; (2) received a recommendation from the superintendent that they be rehired; and (3) were, in fact, rehired as substitute bus drivers. As they had before, all * * * [appellants] gave notification to their supervisor at the end of the 1992–93 school year that they wished to be rehired for the 1993–94 school year.

"Before the summer of 1993, none of * * * [appellants] had ever applied for unemployment benefits during the summer months, while they were unemployed. Apparently, no other substitute bus drivers besides * * * [appellants] had ever applied for unemployment benefits during the summer either. Near the end of the 1992–1993 school year, however, * * * [appellant] Valot learned that a

substitute bus driver working for a different school system had collected unemployment benefits during the summer months. Valot relayed this information to Hansen, Roosa, and other substitute bus drivers. Valot also learned, however, that another substitute bus driver employed by the School Board had once been warned to relinquish an existing unemployment claim, or lose her job. * * * [Appellants] thus became concerned that they might jeopardize their own rehiring if they filed a claim for unemployment benefits over the summer. * * * [Appellants] asked their supervisor for advice, and their supervisor suggested that * * * [appellants] speak with * * * Byers. * * *

" * * * [Appellants] met with Byers in June of 1993. * * * [Appellants] stated to Byers that they were thinking of applying for unemployment benefits, but wanted to know if doing so would jeopardize their rehiring. Byers responded that he expected to recommend to the School Board that they be rehired, but that he could not predict what the School Board would do. Byers added that the School Board normally followed his recommendations. * * * [Appellants] thereafter applied for, and received, unemployment benefits.

"On August 16, 1993, the School Board met to consider, among other things, which substitute bus drivers to rehire for the upcoming school year. Prior to the meeting, * * * Byers submitted a list of his recommendations to the School Board members. This list originally included * * * [appellants]. It was made known at the meeting, however, that * * * [appellants] had applied for and collected unemployment benefits during the summer of 1993. This fact was notable to the School Board because the School Board does not pay money into the State of Ohio's unemployment fund; as a result, the School Board, itself, pays for any ex-employee's unemployment benefits 'dollar for dollar.'

"The School Board was unhappy that it had been forced to make unemployment payments for the benefit of * * * [appellants]. For this reason, the School Board decided not to rehire * * * [appellants]. Byers crossed * * * [appellants'] names off of his list of recommended substitute bus drivers, and the School Board then voted to rehire all of the individuals whose names remained on the list. * * * [Appellees] candidly admit, under oath, that the only reason the School Board did not rehire * * * [appellants] for the 1993–94 school year was because * * * [appellants] had filed for unemployment benefits. Deposition testimony describing the School Board's August 16, 1993 meeting makes it clear that * * * [appellants'] receipt of unemployment benefits was the sole factor motivating the School Board not to rehire * * * [appellants].

"When * * * [appellants] learned that they had not been rehired, they personally contacted the School Board to learn why. The School Board told * * * [appellants] they had not been hired because they had sought and obtained unemployment benefits, the receipt of which translated into loss of the School

Board's own revenue. * * * [Appellants] offered to repay to the School Board the benefits that they had received in exchange for being allowed to return to their jobs. The School Board refused this offer."

On February 24, 1994, appellants filed a five-count suit in federal court against the School Board, individual members of the School Board, and Byers, alleging that appellees violated their constitutional rights under color of state law, in violation of Section 1983, Title 42, U.S.Code, and that appellees tortiously violated the public policy of Ohio. The district court granted summary judgment in favor of appellees on the constitutional claims and dismissed the state law claim, without prejudice, for lack of a substantial federal claim. See *Valot*, 957 F.Supp. 991. The decision was affirmed on appeal. *Valot v. Southeast Local School Dist. Bd. of Edn.* (C.A.6, 1997), 107 F.3d 1220.

Appellants filed a complaint in the Portage County Common Pleas Court alleging that appellees' refusal to renew appellants' contracts was unlawful under the public policy of Ohio and contrary to the Ohio Constitution. Summary judgment was granted in favor of appellees, and the case is now before us on appeal.

In the sole assignment of error, appellants assert that the trial court erred when it granted summary judgment in favor of appellees. Appellants argue that public policy prohibits an employer from terminating an employment relationship because the employee exercises rights conferred by state law. They urge this court to apply the law set forth in *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, beyond employee discharge cases.

In *Greeley*, Robert Greeley, an at-will employee, was allegedly discharged by his employer because the employer had received a court order requiring the employer to withhold a portion of Greeley's wages for child support. Greeley sued his former employer for wrongful discharge, since R.C. 3113.213(D) prohibits employers from discharging an employee on the basis of a child support wage withholding order. R.C. 3113.213(D) sets forth a monetary fine for employers who violate the statute but does not provide a discharged employee a private cause of action.

The Supreme Court of Ohio held:

"1. Public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute. (R.C. 3113.213[D], construed and applied.)

"2. Henceforth, the right of employers to terminate employment at will for 'any cause' no longer includes the discharge of an employee where the discharge is in violation of a statute and thereby contravenes public policy. (*Fawcett v. G.C.*

*Murphy & Co.* [1976], 46 Ohio St.2d 245, 75 O.O.2d 291, 348 N.E.2d 144, modified.)

"3. In Ohio, a cause of action for wrongful discharge in violation of public policy may be brought in tort." *Greeley* at syllabus.

Appellants urge this court to apply the public policy exception set forth in *Greeley* to the case *sub judice,* where no employment relationship exists between appellants and appellees. We have thoroughly reviewed *Greeley* and find it inapplicable because appellants were not at-will employees with an employment relationship but, instead, they were contractual employees with no existing contractual relationship.

Next, appellants argue that the Ohio Constitution prohibits an employer from terminating an employment relationship because the employee exercised his rights conferred by state law. Specifically, appellants assert that Sections 1 and 16, Article I of the Ohio Constitution prohibit appellees from refusing to rehire appellants for exercising their statutory rights to apply for unemployment compensation benefits.

Section 1, Article I of the Ohio Constitution states:

" * * * All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."

Section 16, Article I of the Ohio Constitution provides:

" * * * All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law * * *."

We conclude that appellants have failed to cite constitutional authority for a violation under Section 1 and Section 16 of Article I of the Ohio Constitution.

Having reviewed the record to determine if summary judgment was appropriate, this court can come to but one conclusion. The material facts are not in dispute, and appellees are entitled to judgment as a matter of law. The assignment of error is not well taken.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

FORD, P.J., concurs.

WILLIAM M. O'NEILL, J., dissents.

MARY CACIOPPO, J., retired, of the Ninth Appellate District, sitting by assignment.

WILLIAM M. O'NEILL, Judge, dissenting.

For the reasons that follow, I respectfully dissent. I believe the majority places too much emphasis on the form of the employment relationship to the detriment of its substance. While it is very helpful to the appellees' argument to characterize this matter as a "failure to rehire," the facts involved dictate a different analysis. Appellants were school bus drivers for a school district. As demonstrated by the facts that were stipulated to by the parties, the employment relationship had existed for at least the three years preceding its termination by the School Board.

It is clear that the controlling question to be resolved in this litigation is whether the employer school district had the authority, under Ohio law, to terminate an unblemished employment relationship in retaliation for an employee having filed for unemployment compensation benefits. There is no distinction between an employee who is **fired** for exercising a statutory right and one who is **eliminated** from the workforce by some other means, such as refusal to renew a long-standing contract. Both employment situations have been terminated by the employer. Both employees are unemployed. There is nothing in the record before this court to suggest that this was anything other than the termination of an existing employment relationship. And there is a stipulation that the decision to terminate the relationship was based solely upon appellants' decision to apply for and receive unemployment compensation.

Ohio is an "employment-at-will" state. Therefore, the legal precedent in this state essentially supports the proposition that an employer can terminate an employment relationship, or fire the worker, at will. Such a right, however, recognized at common law, is not without limitation. The law in Ohio prohibits the termination of an employee in retaliation for that employee having exercised a right established by the Ohio Legislature. Such a termination violates public policy. As stated by the Supreme Court of Ohio in *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, at paragraph two of the syllabus, "The right of employers to terminate employment at will for 'any cause' no longer includes the discharge of an employee where the discharge is in violation of a statute and thereby contravenes public policy."

It is beyond dispute that the public policy in Ohio, as established by the Ohio legislature, is that when one is unemployed, one is entitled to unemployment compensation. And it is further beyond dispute that the employees in this

matter had their very livelihoods terminated when they availed themselves of that statutorily provided benefit. That is a violation of public policy.

Recently, the Supreme Court of Ohio revisited the question of employment at will and its limitations in the case of *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 677 N.E.2d 308. In a carefully reasoned analysis, the court clearly indicated that the question of whether an employment termination violates public policy should be subjected to a four-part analysis that essentially tests the justification for the termination versus the effect it will have on the public policy of the state of Ohio. Specifically, the court has directed that reviewing courts determine whether (1) a clear public policy was manifested in a state or federal Constitution, *statute* or administrative regulation, or in the common law; (2) the firing would jeopardize that public policy; (3) the dismissal was motivated by conduct related to the public policy; and (4) the employer had a legitimate business justification for the termination. *Id.* at 151, 677 N.E.2d at 321–322.

It is clear that in the instant matter there is (1) a public policy that unemployed workers should receive unemployment compensation as directed by statute; (2) that public policy would be dramatically affected if employers were permitted to fire any employee who filed for compensation; and (3) the subject termination was related solely to the permitted conduct. The only possible defense to this employment termination would be the employer's proffered legitimate business justification for its conduct. In the instant matter, the employer offers as justification the fact that it does not participate in the Unemployment Compensation Fund for THESE EMPLOYEES and that, therefore, its annual budget was adversely affected by the subject claims for unemployment compensation. This argument simply lacks merit, and is clearly contrary to public policy. Every employer in Ohio would love to have the luxury of simply stating that they choose not to contribute to the Unemployment Compensation Fund because it takes away from their bottom line! The argument not only lacks merit, but is particularly troubling coming from a public employer. These workers were unemployed for the summer months, by virtue of the School Board's refusal to offer them new contracts, and it is undisputed that at the time they filed for unemployment benefits, they were entitled to the funds they received. The benefits were in fact paid because the state of Ohio authorized compensation in situations such as these. Appellants lost their positions for receiving benefits that the public policy of Ohio dictates they should receive. Therefore, I would find this matter to be a violation of the Supreme Court's rulings in *Greeley* and *Kulch* and would reverse the holding of the trial court.