**Patrick GOUGE, Plaintiff**

v.

**BAX GLOBAL INC., et al., Defendants**

No. 3:01–CV–7639.

United States District Court,
N.D. Ohio,
Western Division.

March 11, 2003.

Connie F. Zemmelman, Harland M. Britz, Britz & Zemmelman, Toledo, OH, Thomas R. Port, Danville, CA, for Patrick B. Gouge.

Emerson C. Moser, Michael W. Hawkins, Trina M. Walton, Dinsmore & Shohl, Cincinnati, OH, for BAX Global, Inc., The Pittson Company, Inc., Air Transport International, L.L.C.

## ORDER

CARR, District Judge.

Plaintiff Patrick Gouge brings ·this case against defendants BAX Global, Inc. ("BAX") and Air Transport International, L.L.C. ("ATI"), alleging fraud, promissory estoppel, and breach of public policy. This court has jurisdiction pursuant to 28 U.S.C. § 1332. Pending is defendants' motion for summary judgment. For the following reasons, the motion shall be granted.

## BACKGROUND

Plaintiff is a resident of Texas, and a former employee of BAX and ATI. BAX, a Delaware corporation, maintains its principal place of business in California. ATI, a Nevada limited liability company, maintains its headquarters in Arkansas. BAX owns 99 percent of ATI. The remaining 1 percent of ATI is owned by BAX Air Inc., a corporation wholly owned by BAX. The events surrounding BAX's April 30, 1998, acquisition of ATI are at issue in this case.

BAX offers freight forwarding via aircraft and trucks, and manages freight movement. ATI provides air transport of cargo for freight forwarders. Before the acquisition, BAX contracted with ATI to fly routes for BAX's customers who needed air cargo delivery. BAX owned and leased the airplanes, but ATI subleased them and flew the routes, a service known as providing "lift" for the cargo. ATI was a major supplier of BAX's lift.

In early 1997, BAX learned that ATI was having financial difficulties when ATI began increasing the prices it charged BAX for its services. BAX feared that ATI would either file for bankruptcy or be sold. BAX sought to reduce the risk of losing its lift capability by applying for FAA certification to start its own airline,

BAX Air, to replace ATI as a supplier of its lift.

BAX estimated that it would cost $12,000,000 to get BAX Air certified, and that it would be at least two years before the airline was operational. To obtain certification, the FAA requires new airlines to staff five specific management-level positions, including a Director of Safety. BAX contracted with an aviation consulting firm to oversee the start-up, and a consultant placed an ad seeking candidates for the five required positions on June 30, 1997.

During this time, plaintiff was the Vice President of Corporate Safety at Trans World Airlines, Inc. ("TWA"), earning between $84,000 and $85,000 per year. Intrigued by the opportunity to help start a new airline, plaintiff responded to the ad, applying for the position of Director of Safety. Plaintiff then researched BAX and learned that ATI was a major lift provider for BAX. Plaintiff considered ATI's safety record "horrific." (Pl. Depo. at 58).

In October, 1997, plaintiff flew to Toledo for a job interview with Mike Odom, then BAX's Senior Vice President of Hub Operations. Odom was leading BAX's effort to start BAX Air. At the interview, plaintiff says Odom told him BAX was "going to start its own airline" because the company was frustrated with ATI's financial difficulties and unreliability. (Pl. Depo. at 67). Plaintiff asked Odom why BAX did not purchase ATI instead of starting its own airline, and Odom's response was, "we don't have anything to do with ATI, they've got unions on the property, we're a non-union company and they've got the issues and problems and we just don't want them on our property." (Pl. Depo. at 85–86). Plaintiff alleges Odom told him that though BAX had considered buying ATI, it had decided not to do so, and BAX was committed to starting its own airline, "full speed ahead," so that BAX could "be in charge of [its] destiny." (Pl. Depo. at 86). Plaintiff alleges he told Odom he was glad BAX would not buy ATI, "because I wouldn't want to be associated with a company with as poor a track record and history as ATI had." (Pl. Depo. at 86).

About a week later, plaintiff traveled to Irvine, California, for a second job interview with Jay Arnold, BAX's Senior Vice President of Human Resources. Arnold allegedly reiterated BAX's commitment to BAX Air. Plaintiff says he asked Arnold why BAX was not buying ATI, and Arnold told him it was because of ATI's unionized workforce. Plaintiff says he told Arnold that "[buying ATI] makes more sense to me, but if you guys want to do this [start-up], then I want to be part of a startup, I don't want to be part of anything else, I just want to be part of the startup." (Pl. Depo. at 89). While in California, plaintiff also met Dennis Eittreim, BAX's President, who allegedly also told him that BAX was moving "full speed ahead" to start a new airline. (Pl. Depo. at 90–91).

On October 28, 1997, BAX sent plaintiff a letter offering him the position of Director of Safety, with a later transfer over to BAX Air, at a salary of $95,000 per year plus benefits. Plaintiff accepted the offer on October 30, 1997. His start date was set for November 25, 1997. Plaintiff alleges BAX officials repeated their assurances about the company's commitment to BAX Air through November 25, 1997.

BAX Air, however, never got off the ground.

In August, 1997, ATI had retained financial advisor Equity Partners, Ltd. to try to sell ATI's assets. Equity Partners managing director Patrick May solicited more than 130 potential buyers for ATI, pitching ATI to BAX at a meeting with Eittreim on September 9, 1997. Twenty of those potential buyers, including BAX, executed confidentiality agreements with ATI and

received copies of the confidential offering memorandum. May sent BAX the confidential memorandum on October 3, 1997. Five of these potential buyers, including BAX, then attended a presentation at ATI and conducted initial due diligence. Three of those five, BAX, World Airways, and Fine Airways, then submitted nonbinding indications of value. BAX sent its nonbinding indication of value on November 26, 1997.

According to May, ATI then entered preliminary negotiations with World Airways, a better bidder. World Airways lost interest, and Fine Airways experienced a financing problem, making BAX the most likely purchaser of ATI as of early December, 1997. Negotiations between BAX and ATI then began in earnest. On December 23, 1997, BAX treasurer James B. Hartough signed a letter of intent to acquire ATI. According to May, even as of December 23, 1997, the deal could have fallen apart "if any ... conditions precedent to closing wouldn't have come about, or through the bankruptcy process if [ATI] got a higher and better offer." (May Depo. at 87).

Meanwhile, as scheduled, plaintiff started his new job in Toledo, Ohio, on November 25, 1997, as BAX's Director of Safety in the start-up of BAX Air. Consultants for BAX already were working on BAX Air's certification when plaintiff arrived in Toledo, as were two more of the five FAA-required management employees. Plaintiff reviewed the project's paperwork during his first week on the job, and during his second week at work, he met with the consultants and the two other management employees, reviewed the start-up timeline, divided the responsibilities, and began work, with a goal of certification by April, 1998.

During the second week of December, 1997, plaintiff alleges, Odom became evasive about giving plaintiff permission to hire employees, and refused to provide the start-up team with offices, computer equipment, or administrative support. Plaintiff says he continued drafting safety manuals, but began to hear "rumblings within the industry that there was an acquisition going to take place." (Pl. Depo. at 107). On December 17, 1997, Odom told the start-up team that "things have changed" and that BAX was acquiring ATI. (Pl. Depo. at 107, 111).

In January, 1998, plaintiff was transferred to Little Rock, Arkansas, and began the task of integrating ATI with BAX. In Little Rock, plaintiff alleges that Arnold and Eittreim told him that though BAX was acquiring ATI, "I don't want you guys to worry about it, we're going to take care of you. You guys are going to get to run it." (Pl. Depo. at 117).

ATI filed for bankruptcy in February, 1998. BAX and ATI executed a membership interest acquisition agreement on February 3, 1998, and BAX acquired ATI through bankruptcy proceedings on April 30, 1998.

The acquisition meant that BAX would not create BAX Air. BAX terminated its relationship with the consulting firm, after paying it more than $559,000 in consulting fees from the middle of 1997 until spring, 1998. BAX terminated all of ATI's senior management, but retained about 450 ATI employees. BAX transferred plaintiff's status from an at-will BAX employee to an at-will ATI employee on May 1, 1998, under the title of ATI's Director of Safety.

Before the acquisition, ATI's Director of Safety was Harlan Benjamin. After the acquisition, Benjamin became the Special Assistant to the President of ATI for Regulatory Compliance. On December 16, 1998, ATI's president and CEO, James Hobson, told plaintiff that he would be laid off because ATI could not afford to employ both plaintiff and Benjamin in the area of

safety. Hobson chose Benjamin, who was more experienced in the areas of airline safety and regulatory compliance, as safety director.

Plaintiff, who once had been a military pilot, was offered flight training to become an ATI line pilot. Passing the training was a condition of continued employment with ATI. Plaintiff did not pass the training, and was terminated on April 30, 1999.

Plaintiff filed suit against BAX and ATI on December 14, 2001, alleging fraudulent inducement to employment, promissory estoppel, and wrongful termination in violation of the public policy of the state of Arkansas. Defendants have moved for summary judgment.

### STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be accepted as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

### DISCUSSION

#### I. Fraudulent Inducement to Employment

Plaintiff claims that defendants fraudulently induced him to work for them. Plaintiff's claim for fraudulent inducement to employment is based on his assertion that he would not have accepted BAX's employment offer if he had known that BAX was even considering buying ATI. He alleges that because he told BAX representatives that he did not want to be an ATI employee, BAX should have told him that it was considering the acquisition. This alleged duty arose, plaintiff argues, during the October, 1997, job interviews with BAX representatives, and continued until his starting date of November 25, 1997, because plaintiff alleges that he could have retained his position at TWA until that date.

Defendants argue that BAX first began seriously to consider acquiring ATI in December, 1997. While defendants acknowledge BAX had been one of several interested buyers of ATI prior to December, 1997, BAX had a separate plan to form its own airline. Defendants argue that in December, 1997, BAX learned ATI intended to declare bankruptcy, so BAX placed its BAX Air plans on hold and shifted its attention to acquiring ATI.

█ The tort of fraud or fraudulent inducement has the following elements: 1) an actual or implied false representation concerning a fact or, where there is a duty to disclose, concealment of a fact, material to the transaction; 2) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; 3) intent to induce reliance on the representation; 4) justifiable reliance; and 5) injury proximately caused by the reliance. *Yo–Can, Inc. v. The Yogurt Exchange, Inc.*, 149 Ohio App.3d 513, 525, 778 N.E.2d 80 (2002); *Watkins v. The Cleveland Clinic Foundation*, 130 Ohio App.3d 262, 277–78, 719 N.E.2d 1052 (1998) (same).[1]

### 1. Representation

To state a claim for fraud, plaintiff must allege a representation capable of constituting fraud.

█ Fraud is not predicated on a representation concerning a future event, as such representation is more in the nature of a promise or contract or constitutes mere predictions or opinions about what the future may bring. *Yo–Can*, 149 Ohio App.3d at 526, 778 N.E.2d 80 (citing *Link v. Leadworks Corp.*, 79 Ohio App.3d 735, 742, 607 N.E.2d 1140 (1992)). A promise made with the present intention not to perform, however, is a misrepresentation of an existing fact even if the promised performance is to occur in the future. *Id.* (citations omitted).

In this case, the alleged false representations were made by BAX officials and concerned BAX's commitment to starting BAX Air and disinterest in acquiring ATI. Plaintiff alleges that in October, 1997, Odom and Arnold told plaintiff that BAX would not purchase ATI because ATI was unionized, and that Odom and Eittreim

---

1. Plaintiff also relies on Restatement of the Law (Second), Torts, § 551, Liability for Nondisclosure. It states:

   1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

   2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

   a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

   b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

   c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

   d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

   e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

told him BAX was committed to starting BAX Air "full speed ahead." (Pl. Depo. at 86, 90–91). Plaintiff alleges Odom told him that BAX was "going to start its own airline," because BAX wanted to "be in charge of [its] destiny," and that BAX officials "just don't want [ATI] on our property." (Pl. Depo. at 67, 85–86).

■ None of these representations could constitute a basis for a fraud claim. The statements that BAX was moving "full speed ahead" with BAX Air out of a desire to be "in charge of its destiny" are statements of opinion. Statements of opinion and "puffing," or dealer's talk, cannot be reasonably relied upon, and, therefore, such representations cannot form the basis of fraud claims. *J.B. Colt Co. v. Wasson*, 15 Ohio App. 484, 487 (1922).

Likewise, statements that BAX was "going to start its own airline," would not purchase ATI, and did not "want [ATI] on [its] property" are representations concerning future events. "Fraud cannot be predicated upon promises or representations relating to future actions or conduct." *Tibbs v. National Homes Constr. Corp.*, 52 Ohio App.2d 281, 286, 369 N.E.2d 1218 (1977). During plaintiff's recruitment to the start-up airline, BAX officials may have told plaintiff what the company intended to do and what the company intended not to do, but these representations, unless false when made, cannot constitute a basis for a fraud claim.

### 2. Falsity

■ Plaintiff contends that the statements were false when made. To sustain an action for fraud, plaintiff must prove that the alleged representation was made falsely, with knowledge of its falsity, or with utter disregard and recklessness regarding its truth or falsity. *Yo–Can*, 149 Ohio App.3d at 525, 778 N.E.2d 80.

■ Plaintiff alleges that BAX was not committed to starting a new airline, but rather, that it knew it was likely to acquire ATI even as its officials hired plaintiff in October, 1997, and welcomed him to work on November 25, 1997. Plaintiff and defendants, however, agree that BAX did not become seriously interested in acquiring ATI until December, 1997, after ATI announced its intent to declare bankruptcy. Plaintiff has not controverted defendant's proof that as of November 26, 1997, the day after plaintiff started working at BAX, there were as many as five potential buyers of ATI. When the field narrowed to three, ATI first entered preliminary negotiations with World Airways, a better bidder. By all accounts, BAX became the likely purchaser of ATI only when World and the other potential buyer dropped out, in early December, 1997. Consequently, there is no question that BAX's statements on and prior to November 25, 1997, concerning its disinterest in ATI and commitment to BAX Air, were true when made.

Plaintiff alleges that BAX's plan to apply for FAA certification was a bargaining chip in its negotiations to acquire ATI. However, plaintiff cannot explain why BAX, as of its June, 1997, advertisement, soliciting employment applications for BAX Air. ATI, moreover, did not obtain a financial advisor until August, 1997, and did not approach BAX about purchasing the company until September, 1997. Plaintiff has not produced any evidence that BAX spent $559,000 in consulting fees and hired at least three management-level employees for any purpose other than in anticipation of starting BAX Air.

There is no genuine issue of material fact concerning whether the statements were false when made, and the fact that subsequent and unforeseen events rendered the statements false is not enough reason to deny summary judgment on the claim of fraudulent inducement to employment.

### 3. Duty to Disclose

To the extent that plaintiff alleges fraudulent concealment of BAX's interest in acquiring ATI, plaintiff must show that BAX officials had a duty to disclose that information to him.

■ Fraudulent inducement may occur where there is a duty to disclose a fact material to the transaction, but that fact is concealed. *Yo–Can*, 149 Ohio App.3d at 525, 778 N.E.2d 80. According to Restatement of the Law (Second), Torts, § 551(2), that duty can arise when one party to a business transaction knows matters "that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading." BAX's statements that it would not purchase ATI were partial and misleading when made in October and November, 1997, plaintiff argues, because company officials did not disclose the fact that BAX then was engaged in the preliminary investigation of purchasing ATI.

In *Sneyd v. International Paper Co.*, 142 F.Supp.2d 819 (E.D.Mich.2001), plaintiffs had been hired by defendant Mead Corporation to work for a division of the company, and Mead sold the division about six months later. When the plaintiffs were laid off, they sued under the theory of fraudulent concealment, and the court granted summary judgment. 142 F.Supp.2d at 821. The court noted that plaintiffs "can point to no legal authority for the proposition that a corporation has a duty to disclose to potential employees that it is contemplating the sale of, or has decided to sell, a subsidiary corporation that it owns and for whom those potential employees would work."

■ Plaintiff in this case, likewise, has cited no legal authority for the proposition that as a job applicant, he was entitled to learn of BAX's interest in ATI.[2]

**2.** In fact, I note that in *Warner Comm., Inc. v. Murdoch, et al.*, 581 F.Supp. 1482 (D.Del. 1984), the district court stated that:

> It is well established that the federal securities laws do not impose a duty to disclose information regarding current or future plans that are uncertain and contingent in nature.... This principle is grounded in the concern that it might be just as misleading to investors to disclose contingent plans as it might be to fail to disclose such plans. Requiring disclosure would place a party in the harsh position of facing liability if the plans are not disclosed but they come to fruition, as well as liability if the plans are disclosed but they fail to be consummated.

581 F.Supp. at 1491 (citations omitted). At least one court has applied this test to a claim for fraudulent concealment in the employment context, finding that the securities regulations precluded any finding of a duty to disclose uncompleted corporate negotiations to a job applicant. *Stowman v. Carlson Cos., Inc.*, 430 N.W.2d 490, 493 (Minn.Ct.App. 1988).

Moreover, according to one author, as of 1997 no court had found that, as a matter of law, an employer has an affirmative duty to reveal facts about its financial status or business dealings to at-will employees. Sandra J. Mullings, *Truth–In–Hiring Claims And The At–Will Rule: Should An Employer Have A License To Lie?*, 1997 Colum. Bus. L.Rev. 105, 127. Employees asserting fraudulent concealment generally only win when the employers give them false or misleading impressions, thereby creating a duty to disclose and correct those impressions. *Id.* The facts concealed from the plaintiff in this case concerned a possible transaction with another company, a transaction in which BAX was not recognized as the favored buyer until after plaintiff started working there. Conversely, the facts concealed from winning plaintiff-employees in other cases tend to concern matters completely within the defendant-employers' control, such as internal funding allocations for projects. *See, i.e., Clement–Rowe v. Michigan Health Care Corp.*, 212 Mich.App. 503, 538 N.W.2d 20 (1995) (plaintiff was recruited to defendant employer with promise that funds for her position had been allocated, even though the funds had not been allocated and layoffs were foreseen).

Plaintiff argues that his repeated statements that he did not want to work for ATI created a duty of disclosure in BAX officials, who should have told him that there was a chance he would become an ATI employee. Under Restatement of the Law (Second) of Torts, § 551(2)(d), a party to a business transaction has the duty to disclose to the other, before the transaction is consummated, "the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; ..." Plaintiff's statements that he did not want to work for ATI could have informed BAX officials that he was about to act in reliance upon their assertions that BAX would not acquire ATI.

However, as noted above, plaintiff has not shown there is a genuine issue of material fact as to whether these assertions were false when made. Consequently, plaintiff cannot make out a case for fraudulent concealment.

### 4. Justifiable Reliance

Even if the alleged statements constituted false representations, or the alleged concealment occurred in violation of a duty to disclose, to establish a claim for fraudulent inducement, plaintiff must show justifiable reliance.

In determining whether there was justifiable reliance, one looks to the relationship between the parties. *Mussivand v. David*, 45 Ohio St.3d 314, 322, 544 N.E.2d 265 (1989). The question of justifiable reliance is one of fact. *Lepera v. Fuson*, 83 Ohio App.3d 17, 26, 613 N.E.2d 1060 (1992).

■ For reasons both subjective and objective, plaintiff cannot claim that he justifiably relied upon the representations made to him.

Subjectively, plaintiff's own deposition shows that he doubted the representations made to him.

At his interview with Odom, plaintiff stated:

I asked him why are you starting an airline, it's an extremely expensive venture, you know, 10, 20 million dollars could be poured into starting an airline, and I asked him why don't you just buy ATI, they're your existing carrier, be a lot more cost effective.

(Pl. Depo. at 85).

At his interview with Arnold, plaintiff stated:

I once again reiterated I still don't understand why you guys are doing this. [ATI] has your jets and why aren't you just going to buy them? I mean they've got to be a steal if they're in financial difficulty, the way I'm led to believe, and once again, [Arnold] was very adamant about [starting BAX Air].

(Pl. Depo. at 89).

Objectively, plaintiff's claim of justifiable reliance fails because, as noted, defendants' representations amounted to statements of future intentions and conduct, and opinion, which cannot justifiably be relied upon as a matter of law. *Tibbs,* 52 Ohio App.2d at 286, 369 N.E.2d 1218; *J.B. Colt,* 15 Ohio App. at 487. Furthermore, the plaintiff, then a vice president of TWA, must have realized that starting a new airline was a risky proposition, and that even with the best of intentions on BAX's part, something might have prevented the plan from succeeding. Plaintiff also knew that BAX had at least considered buying ATI. He knew that BAX and ATI had a close business relationship, and that ATI was in trouble financially. He also knew that BAX Air had not received its FAA certification, and that he had been hired as part of a two-year, multi-million-dollar cer-

tification process. Under the circumstances, plaintiff could not justifiably have relied upon defendants' representations that it would start BAX Air and would not buy ATI.

Defendants made no false representations and created no false impressions through concealment. Even if defendants had done so, plaintiff could not justifiably have relied upon them. Defendant's motion for summary judgment on plaintiff's claim for fraudulent inducement to employment must be granted.

## II. Promissory Estoppel

Plaintiff argues that he was promised that BAX would not acquire ATI and would start BAX Air, and relied upon these promises to his detriment. He asserts a claim for promissory estoppel.

The Ohio Supreme Court has held that in the area of employment contracts, there is "a strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other." *Henkel v. Educ. Research Council,* 45 Ohio St.2d 249, 255, 344 N.E.2d 118 (1976); *see also Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 102–03 & n. 1, 483 N.E.2d 150 (1985) (same). In this case, the parties agree that plaintiff was terminable at will.

Promissory estoppel is an exception to rebut a presumption that the employment was at-will. *Mers,* 19 Ohio St.3d at 105, 483 N.E.2d 150. Specifically, *Mers* held that this exception applied to oral at-will agreements:

> Where appropriate, the doctrine of promissory estoppel is applicable and binding to oral employment-at-will agreements when a promise which the employer should reasonably expect to induce action or forbearance on the part of the employee does induce such action or forbearance, if injustice can be avoided only by enforcement of the promise.

The test in such cases is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted in and was detrimental to the employee.

*Id.*

The holding in *Mers* has been extended to written at-will employment agreements. *Kelly v. Georgia–Pacific Corp.,* 46 Ohio St.3d 134, 139, 545 N.E.2d 1244 (1989) (denying summary judgment where employee had written at-will employment agreement but alleged oral promises of continued employment). Plaintiff had a written at-will employment agreement.

■ To maintain a promissory estoppel claim, an at-will employee must allege "detrimental reliance on specific promises of job security." *Wing v. Anchor Media, Ltd. of Texas,* 59 Ohio St.3d 108, 110, 570 N.E.2d 1095 (1991) (citations omitted). *Rudy v. Loral Defense Systems,* 85 Ohio App.3d 148, 154, 619 N.E.2d 449 (1993); *Shaw v. J. Pollock & Co.,* 82 Ohio App.3d 656, 660, 612 N.E.2d 1295 (1992) (same); *see also Maxwell v. GTE Wireless Service Corp.,* 121 F.Supp.2d 649, 661 (N.D.Ohio 2000) (employee at will with promissory estoppel claim must show that employer made "some representation by the employer which may reasonably be interpreted as limiting the employer's ability to terminate the employee at will") (citing *Penwell v. Amherst Hosp.,* 84 Ohio App.3d 16, 19, 616 N.E.2d 254 (1992)). The promise must be "clear and unambiguous" in its terms. *Rudy,* 85 Ohio App.3d 148, 154, 619 N.E.2d 449 (1993). Additionally, the detrimental reliance must be "justified and reasonable." *Penwell,* 84 Ohio App.3d at 19, 616 N.E.2d 254.

Courts do not allow vague assurances of job security to serve as the basis for promissory estoppel claims. *See, i.e., Rudy,* 85

Ohio App.3d at 154, 619 N.E.2d 449 (employee who was promised that he *could* be called back to work could not sue for promissory estoppel); *Shaw,* 82 Ohio App.3d at 660, 612 N.E.2d 1295 (employee who alleged he was promised at least one year to make the employer profitable, but who was terminated after less than one year, could not sue for promissory estoppel); *Wing,* 59 Ohio St.3d at 110, 570 N.E.2d 1095 (employee who alleged he was promised future equity participation in the company had not received a specific promise of continued employment).

■ Furthermore, "[a] promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception to the well-established doctrine of employment-at-will." *Wing,* 59 Ohio St.3d at 110-11, 570 N.E.2d 1095. Plaintiff's evidence, at most, shows that he was promised future opportunities—in this case, a position at a start-up airline that had not yet been established. Without a specific promise of continued employment at that airline, plaintiff's promissory estoppel claim fails.

Plaintiff alleges that Arnold and Eittreim told him, after BAX announced its acquisition of ATI, "I don't want you guys to worry about it, we're going to take care of you. You guys are going to get to run it." (Pl. Depo. at 117). This statement is not a specific promise of continued employment at ATI. Plaintiff admits that he was not promised any length of employment at either BAX or BAX Air. Instead, plaintiff has alleged he was promised that BAX would not acquire ATI. He seems to argue that this promise implied job security, inasmuch as it implied that BAX Air would one day exist. However, an implied promise of job security does not constitute a specific promise of continued employment.

Even if plaintiff had received specific promises of continued employment, plain-

tiff could not reasonably and justifiably have relied on them. First, BAX's statements that BAX intended to seek certification for BAX Air, instead of acquiring ATI, were made before plaintiff was hired. BAX had not promised the plaintiff any employment, let alone continued employment. Second, and more fundamentally, BAX representatives knew that plaintiff was aware that BAX Air was a prospective airline, and that many legal and financial hurdles stood between plaintiff's hiring and the first BAX Air flight. It would be logically inconsistent to find that plaintiff justifiably relied on a specific promise of continued employment at an as-yet uncertified airline. Consequently, plaintiff cannot show reliance.

Plaintiff cannot maintain his promissory estoppel claim in light of his failure to allege a specific promise of job security. Defendants' motion for summary judgment on this claim, therefore, must be granted.

## III. Termination in Violation of Public Policy

Plaintiff alleges that he was terminated in violation of public policy. He alleges that his termination was retaliation for his actions, as Director of Safety, of notifying other ATI officials of ATI's alleged: 1) noncompliance with hazardous materials regulations; 2) practice of reporting deferred mechanical defects as having been repaired when they had either not been repaired or had not been completed; and 3) practice of allowing unauthorized personnel to ride in cockpits.

### 1. Choice of Law

Plaintiff's complaint alleges defendants discharged him in violation of the public policies of the state of Arkansas, and argues his claim using Arkansas law. Defendant also relies upon Arkansas law in addressing the claim.

■ A federal court sitting in a diversity action must apply the conflicts of law rules of the state in which it sits. *Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 820 (6th Cir.1990).

In Ohio, however,

[t]he resort to principles of conflict of laws is necessary only if there is an actual conflict between local law and the law of another jurisdiction. The party asserting the application of the foreign law has the initial burden to demonstrate such a conflict with the forum state's law, and local law applies if a party alleging that the law of a foreign jurisdiction applies fails to demonstrate a conflict between local law and the law of that jurisdiction.

16 O. Jur.3d Conflict of Laws § 1 (citing *Cross v. Carnes,* 132 Ohio App.3d 157, 724 N.E.2d 828 (1998)); *see also The Andersons, Inc. v. Consol, Inc.,* 185 F.Supp.2d 833, 836 (N.D.Ohio 2001) (Carr, J.) ("A court must conduct conflict of laws analysis only if there is an actual conflict between local law and the law of another jurisdiction."); *Akro–Plastics v. Drake Indus.,* 115 Ohio App.3d 221, 224, 685 N.E.2d 246 (1996) (same).

■ Where the party seeking the application of foreign law fails to demonstrate a conflict, Ohio law governs. *Cross,* 132 Ohio App.3d at 168, 724 N.E.2d 828 (same); *Akro–Plastics,* 115 Ohio App.3d at 224, 685 N.E.2d 246 (same); *Avenell v. Westinghouse Elec. Corp.,* 41 Ohio App.2d 150, 153 n. 3, 324 N.E.2d 583 (1974) (where the parties identify no significant difference between Ohio and foreign law, review is confined to the law of Ohio).

For example, in *The Andersons,* the parties agreed that Ohio law governed some of plaintiff's claims, but disagreed on what state's law applied to plaintiff's tort claims, "because neither party presents an argument in favor of applying non-local law to plaintiff's other claims." 185 F.Supp.2d at

836. In that case, this court did not embark upon a conflicts-of-law analysis, because under either state's applicable statute of limitations, the plaintiff's claim was timely. Therefore, Ohio law governed because "neither party has demonstrated a meaningful conflict of laws for any of plaintiff's claims." *Id.*

Here, plaintiff, seeking application of the laws of Arkansas, has not presented any evidence that Arkansas law differs meaningfully from Ohio law on a claim of termination in violation of public policy. Consequently, Ohio law governs on this issue. But, because plaintiff's complaint does not make out a claim for violation of Ohio's public policy, instead pleading termination in violation of Arkansas' public policy, summary judgment must be granted as to the claim.

Alternatively, if a conflicts-of-law question is presented in this case, the evidence presented points to Arkansas law under Ohio's choice-of-law analysis.

■ Whether a foreign cause of action sounds in tort or contract is a matter of procedure to be decided by forum law. *Mahalsky v. Salem Tool Co.,* 461 F.2d 581, 583–84 (6th Cir.1972). Arkansas views claims for wrongful discharge in violation of public policy as contract actions. *Sterling Drug v. Oxford,* 294 Ark. 239, 249, 743 S.W.2d 380 (1988). Ohio treats claims for wrongful discharge in violation of public policy as tort actions. *Greeley v. Miami Valley Maintenance Contractors,* 49 Ohio St.3d 228, 235, 551 N.E.2d 981 (1990). This court should treat the claim as a tort action.

Ohio analyzes choice-of-law issues by using the Restatement of the Law of Conflicts. *Morgan v. Biro Mfg. Co.,* 15 Ohio St.3d 339, 341–42, 474 N.E.2d 286 (1984). When confronted with a choice-of-law issue in a tort action under the Restatement view, a court must begin with Section 146.

*Id.* at 342, 474 N.E.2d 286. Pursuant to this section, a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit. *Id.* To determine the state with the most significant relationship, a court must consider the general principles set forth in Section 145. *Id.* Section 145 states:

1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

a) the place where the injury occurred,

b) the place where the conduct causing the injury occurred,

c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

The principles of Restatement (Second) of the Law of Conflicts § 6 are:

a) the needs of the interstate and international systems,

b) the relevant policies of the forum,

c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

d) the protection of justified expectations,

e) the basic policies underlying the particular field of law,

f) certainty, predictability and uniformity of result, and

g) ease in the determination and application of the law to be applied.

Rest. (Second) of the Law of Conflicts § 6.

■ In this case, plaintiff has claimed termination in violation of the public policies of Arkansas. At the time of his termination, plaintiff was an employee of ATI. Though it is a Nevada limited liability company, ATI's principal place of business is in Little Rock, Arkansas. Plaintiff moved to Little Rock in February, 1998, to work for ATI. Plaintiff's April, 1999, termination occurred in Arkansas. Additionally, the events plaintiff alleges led to his wrongful termination, occurred in Arkansas. The state with the most significant relationship to the alleged injury is Arkansas, under the Restatement principles, because Arkansas was the location of the plaintiff's termination and the conduct giving rise to the termination, and because defendant ATI was headquartered there.

## 2. Arkansas Public Policy

Arkansas recognizes at least four exceptions to the employment-at-will doctrine, excluding implied contracts and estoppel. They include cases in which the employee is discharged 1) for refusing to violate a criminal statute; 2) for exercising a statutory right; 3) for complying with a statutory duty; and 4) in violation of the general public policy of the state. *Sterling Drug,* 294 Ark. at 249, 743 S.W.2d 380. Plaintiff has alleged a claim under the fourth exception, the public policy exception to the employment-at-will doctrine. This exception is limited, and not intended to protect private or proprietary interests. *Id.*

The public policy of a state is found in its constitution and statutes. *Id.* The Arkansas Supreme Court has held that Ark. Code Ann. § 5–53–112, a statute criminalizing retaliation against witnesses, informants, and jurors, establishes an Arkansas public policy in favor of citizen informants

or crime fighters. *Sterling Drug*, 294 Ark. at 250, 743 S.W.2d 380. Consequently, the public policy of Arkansas is contravened if an employer discharges an employee for reporting a violation of state or federal law. *Id.* In this case, plaintiff has alleged reporting to ATI officials his perceived violations of FAA regulations, which are federal law.

■ Where the plaintiff has alleged termination in violation of public policy, but has not cited any statute or constitutional provision that he claims was violated by the conduct of the defendant employer, Arkansas courts have granted summary judgment in favor of the employer. *Johnson v. Sentinel–Record, Inc.*, No. CA01–702, 2002 WL 22036, at *1, 2002 Ark.App. LEXIS 94, at *4 (Jan. 9, 2002); *see also Palmer v. Arkansas Council on Econ. Educ.*, 344 Ark. 461, 40 S.W.3d 784, 790 (2001) ("In order to support her argument, appellant must offer statutory authority to show that her dispute with [appellee] is based upon a violation of the public policy of Arkansas."). It is not enough for plaintiff to allege that he called attention to alleged FAA violations; rather, the plaintiff has the duty to set these statutes or regulations before the court. *See Ball v. State Dep't of Community Punishment*, 340 Ark. 424, 10 S.W.3d 873 (2000). Plaintiff has not done so, and summary judgment must be granted.

■ Even if plaintiff had named the alleged statutory violations, an employee alleging wrongful discharge in violation of public policy must show causation. *Johnson*, 2002 WL 22036, at *2, 2002 Ark.App. LEXIS 94, at *6. Where the employer proffers a legitimate reason for the employee's termination, the employer is entitled to summary judgment unless the employee can show the existence of a genuine issue of material fact. *Id.*, 2002 WL 22036, at *3, 2002 Ark.App. LEXIS 94, at *8.

Where the employee offers mere speculation that he may have been terminated in violation of public policy, he cannot defeat a summary judgment motion. *Haynes v. Reebaire Aircraft, Inc.*, 161 F.Supp.2d 985, 991 (W.D.Ark.2001).

In this case, plaintiff alleges that on two separate occasions, ATI officials told him to "lay off maintenance." (Pl. Depo. at 171) Believing that this meant he "was not to go in and be particularly hard on [maintenance] about compliance issues," plaintiff was "no longer as strong willed with [maintenance]." (Pl. Depo. at 173). If, as he states, plaintiff complied with the alleged requests, then he cannot have been terminated for being particularly hard on maintenance. In fact, ATI adopted many of plaintiff's safety recommendations, and never disciplined him for bringing anything to its attention.

■ Plaintiff has not presented evidence to refute defendants' assertion that he was terminated from his Director of Safety position due to budgetary constraints, and has not contested defendants' assertion that Benjamin was the more qualified safety manager. Consequently, he has failed to show a genuine issue of fact as to causation, an element on which he would bear the burden of proof at trial. *See Palmer*, 40 S.W.3d at 790. Defendants' summary judgment motion on plaintiff's public policy claim must be granted.

## CONCLUSION

Plaintiff has presented no genuine issue of material fact that would preclude summary judgment on his claims of fraudulent inducement, promissory estoppel, or termination in violation of public policy.

**It is, therefore, ordered that:**

Defendants' motion for summary judgment be, and hereby is, granted.

**So ordered.**