OPINION
{¶ 1} Plaintiffs-appellants, Richard H. Hoyt and Pamela Kobell, appeal from the Franklin County Court of Common Pleas grant of summary judgment in favor of defendants-appellees, TALX Corporation and TALX UCM Services, Inc. (collectively referred to as "TALX"). For the following reasons, we affirm that judgment.
 {¶ 2} In December 2000, Nationwide Mutual Insurance Company ("Nationwide") decided to sell the unemployment compensation business unit ("UC unit") of its wholly owned subsidiary, Gates, McDonald 
Company ("Gates"). The UC unit was in the business of administering other companies' unemployment compensation claims and associated tax matters. At that time, Hoyt was a vice president and was in charge of the UC unit operations. He had worked for Gates since 1980. He lived and worked in Ohio. Kobell was the UC unit's National Director for Sales and Service and reported directly to Hoyt. She lived and worked in New Jersey.
 {¶ 3} In early January 2001, Gates' President, Danny Fullerton, told Hoyt that Gates intended to sell the UC unit. Hoyt agreed to assist with the sale of the UC unit. Hoyt engaged two of his managerial team members, Kobell and Bill Lee, to help with the sale. Nationwide also hired an outside investment banker to assist Gates with the sale. The investment banker recommended a limited auction, pursuant to which Nationwide would offer the UC unit to a small number of potential buyers who would have some natural interest in the unit. Gates identified ADP, Ceridian, and United Healthcare as potential buyers. However, these entities did not express an interest in purchasing the business.
 {¶ 4} Subsequently, Gates identified TALX as another potential buyer. Hoyt already had a working relationship with TALX and its president, Bill Canfield. Because of this existing relationship, Hoyt initiated discussions with Canfield in the spring of 2001 to determine whether TALX would be interested in purchasing the UC unit. Canfield told him that TALX was developing a strategy of expansion and that he wanted to meet with Hoyt and Fullerton to discuss the UC unit. In April or May 2001, Canfield met with Hoyt and Fullerton. Canfield explained his proposed plan to enter the unemployment compensation business by buying existing businesses. He told Hoyt that the UC unit would be a good platform to implement this plan. Canfield also told Hoyt that if TALX successfully implemented the plan, Hoyt and his team would run the new company. Hoyt called Kobell and Lee after this meeting and told them about Canfield's potential interest in buying unemployment compensation businesses, including the UC unit. Hoyt also told them about Canfield's statement that their management team would run the new company. However, TALX ultimately declined to pursue the purchase of the UC unit at that time.
 {¶ 5} Thereafter, Hoyt attempted to purchase the UC unit himself. Fullerton gave Hoyt an estimated selling price of $45,000,000. However, Hoyt was only able to raise $35,000,000. Fullerton told Hoyt that Nationwide was not interested in selling the UC unit at that price. In July or August 2001, Hoyt contacted an attorney, Mark Koogler, for assistance in putting together a stronger purchase offer for the UC unit. Koogler told Hoyt about a group of venture capitalists who would be interested in learning more about a potential purchase. However, Hoyt never met with this investor group. Instead, he attempted to obtain additional capital from TALX .
 {¶ 6} In pursuit of that goal, Hoyt flew to St. Louis in August 2001 to meet with Canfield. At that meeting, Hoyt asked Canfield to sign a confidentiality agreement pursuant to which Canfield would keep confidential any information Hoyt disclosed to him concerning Hoyt's potential purchase of the UC unit. Canfield signed the confidentiality agreement. Hoyt told Canfield that he already had raised the majority of the money needed to purchase the UC unit but that he needed additional capital to complete the purchase. Although Canfield expressed renewed interest in purchasing the UC unit, he indicated that TALX was not interested in participating as a minority owner. Canfield again stated that if TALX bought the UC unit, Hoyt and his team would run it.
 {¶ 7} Based upon his discussions with Canfield, Hoyt believed that TALX now had significant interest in purchasing the UC unit outright. Moreover, Hoyt believed that if TALX bought the UC unit, he and his team would run the new business. Hoyt also recognized that his financial risk was much lower if he supported TALX's attempt to purchase the UC unit rather than trying to purchase the UC unit himself. Therefore, Hoyt abandoned his own attempt to purchase the UC unit. Subsequently, Canfield called Hoyt to check on the status of Hoyt's attempts to raise additional money for the purchase of the UC unit. Hoyt told him that he had abandoned his plans. Within a week of that conversation, Canfield called Hoyt and told him that TALX was ready to pursue the purchase of the UC unit.
 {¶ 8} In November 2001, Canfield met with Hoyt, Fullerton, and others and laid out his plan to purchase the UC unit. Canfield described his plan to acquire the UC unit and to use the unit and its management team as a foundation to purchase and consolidate other unemployment compensation companies. Canfield stated that Hoyt and his team would be critical to his strategy and they would have significant responsibilities with the new UC unit. However, Canfield did not identify what specific position Hoyt would have with TALX.
 {¶ 9} In February 2002, representatives from Nationwide, Gates, and TALX met in Columbus, Ohio, to discuss organizational and management issues before the sale. Hoyt believed that Canfield still intended to center TALX's acquisition plan around Hoyt's management team and that Hoyt's team would run the new unemployment business. After the meeting, Canfield met personally with Hoyt, Kobell, Lee, and other senior managers to discuss their feelings about TALX's potential purchase of the UC unit. However, no job offers were made at that time.
 {¶ 10} TALX acquired the UC unit on March 27, 2002 for a total purchase price of $43,250,000.[1] As part of the purchase agreement and an attendant employee services agreement, TALX agreed that all UC unit employees would remain Nationwide employees for 90 days after the sale but their work would benefit TALX. After 90 days, TALX would offer employment to all the employees. Those offers of employment were to include salary and benefits commensurate with their former positions.
 {¶ 11} On the same day TALX acquired the UC unit, it also acquired The Frick Company ("Frick"), the UC unit's largest competitor in the unemployment compensation business. With the purchase of the UC unit and Frick, TALX had acquired 60-70 percent of the unemployment compensation business industry. Both Hoyt and Fullerton were surprised by TALX's acquisition of Frick, as neither knew that TALX was also purchasing the UC unit's largest competitor in the unemployment compensation field.
 {¶ 12} TALX organized a celebratory deal-closing dinner on the night of March 27, 2002 in Columbus, Ohio. At the dinner, Canfield greeted Kobell with a kiss as they sat down for dinner. Later that same night, Canfield presented Hoyt with employment agreements for Hoyt and Kobell. TALX offered Hoyt and Kobell employment as senior executives for a two-year period. TALX offered Hoyt an annual salary of $165,000 and Kobell an annual salary of $120,000. TALX also offered both of them the right to participate in benefit plans and a tenative incentive compensation program. Neither Hoyt nor Kobell signed these agreements nor did they attempt to negotiate any of the terms.
 {¶ 13} On April 3 or 4, 2002, there was a meeting in St. Louis attended by Canfield, Hoyt, Kobell, and representatives of TALX and Frick. Canfield called the meeting to begin the integration of the two companies. Canfield spoke privately with Hoyt before the meeting and told him that Hoyt would not be leading the new UC unit. Canfield did not describe what Hoyt's job responsibilities would be, other than to say that Hoyt would report to him. Canfield had a similar private meeting with Kobell. At the beginning of this meeting, Canfield commented to Kobell that he noticed she did not have a wedding ring and asked her about herself. He went on to tell her that she would head up the service division of the company and Steve Hoffman, a Frick employee, would head up the sales division. Kobell believed that this offer was inconsistent with the statements Canfield made to Hoyt prior to the acquisition. At a dinner later that day, Canfield asked Kobell to sit next to him. Following the meeting, both Hoyt and Kobell were placed on a number of committees established to facilitate the integration process. Hoyt felt that his assignment to certain committees further indicated the diminished role he would have in the new company.
 {¶ 14} On April 19, 2002, TALX's compensation committee met in Columbus, Ohio. At the end of that meeting, Canfield told the committee, including Kobell, that Hoffman would not only head the sales division but would also lead the service division of the company. Kobell was surprised, disappointed, and humiliated by what she perceived as a further diminishment of her role with the company. Shortly thereafter, Hoffman offered Kobell a position as the east region service manager. She neither accepted nor declined the position at that time. Thereafter, she spoke to an attorney about her employment situation.
 {¶ 15} On or about April 29, Canfield met privately with Hoyt. Canfield again stated that Hoyt would not head up the new business entity. Canfield indicated that he had decided to run the new unemployment business group himself and that Hoyt would report to him. Hoyt then expressed a desire to leave the new business entity and to discuss an exit strategy. Canfield indicated that he would consider a consulting agreement with Hoyt.
 {¶ 16} On May 3, 2002, Hoyt wrote a letter to Canfield in which he stated his belief that Canfield had promised him that he (Hoyt) would run the new business entity. He also proposed a separation agreement pursuant to which he would receive two payments of $175,000 plus a three-year consulting agreement. Hoyt copied Spencer Youell, an attorney, on the letter. On May 7, 2002, Youell, representing Kobell, wrote a letter to Canfield. Youell described the sequence of events that led Kobell to believe that her role in the company had been greatly diminished from the role Canfield previously had promised. Youell also requested a separation agreement with TALX to resolve Kobell's issues which included a payment of $432,000 and a one-year consulting agreement.
 {¶ 17} Thereafter, Kobell had lunch with Canfield. Kobell interpreted this meeting as Canfield's attempt to talk her into leaving the new company. She again expressed her disappointment about her diminished role with the company. Canfield allegedly told her that she had spoiled things by consulting with an attorney, but he did not withdraw her still outstanding employment offer.
 {¶ 18} On May 16, 2002, Canfield wrote letters to both Hoyt and Kobell in response to their letters. Canfield asserted that he never promised them any specific positions. He also indicated that he interpreted their letters as rejections of TALX's still outstanding employment offers. Therefore, he withdrew those offers.
 {¶ 19} Hoyt and Kobell continued to assist with the transfer of the UC unit from Gates to TALX. Their employment with Nationwide was terminated pursuant to the employee services agreement on or around June 26, 2002. Pursuant to the purchase agreement, on July 15, 2002, TALX paid Hoyt and Kobell for one day's work.
 {¶ 20} On October 1, 2002, Hoyt and Kobell filed a complaint in the Franklin County Court of Common Pleas against Nationwide, Gates,[2] and TALX. Appellants, both individually and jointly, set forth the following claims against TALX: (1) breach of contract; (2) promissory estoppel; (3) gender and age discrimination; (4) discharge in violation of public policy; (5) fraud; and, (6) unjust enrichment. Ultimately, TALX moved for summary judgment on all of appellants' claims. The trial court granted the motion and entered summary judgment in favor of TALX.
 {¶ 21} Appellants appeal, assigning the following errors:
ASSIGNMENT OF ERROR NO. 1:
The trial court erred in determining New Jersey law applied to appellant Kobell's claims.
ASSIGNMENT OF ERROR NO. 2:
The trial court's determination that no fiduciary duty existed from TALX to appellants and, as a result, no breach of that duty occurred, is against the manifest weight of the evidence.
ASSIGNMENT OF ERROR NO. 3:
The trial court erred in determining that appellants failed to establish their fraud claims.
ASSIGNMENT OF ERROR NO. 4:
The trial court erred in determining that appellants failed to establish their breach of contract claims.
ASSIGNMENT OF ERROR NO. 5:
The trial court erred in determining that appellants failed to establish their promissory estoppel claims.
ASSIGNMENT OF ERROR NO. 6:
The trial court erred in determining that appellants failed to establish their unjust enrichment [claims].
ASSIGNMENT OF ERROR NO. 7:
The trial court erred in determining that TALX did not violate Ohio public policy law when it retaliated against Hoyt and Kobell for retaining legal counsel.
ASSIGNMENT OF ERROR NO. 8:
The trial court erred in determining that TALX did not discriminate against Hoyt based upon his age.
ASSIGNMENT OF ERROR NO. 9:
The trial court erred in determining that Canfield did not sexually harass Kobell and adversely effect her employment with TALX.
 {¶ 22} An appellate court's review of summary judgment is conducted under a de novo standard. Coventry Twp. v. Ecker (1995),101 Ohio App.3d 38, 41; Koos v. Cent. Ohio Cellular, Inc. (1994),94 Ohio App.3d 579, 588. The motion for summary judgment may be granted only when it is demonstrated (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. Harless v. Willis DayWarehousing Co. (1978), 54 Ohio St.2d 64, 67; Civ.R. 56(E).
 {¶ 23} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. Mitseff v. Wheeler (1988), 38 Ohio St.3d 112, syllabus;Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleading, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); Riley v. Montgomery (1984), 11 Ohio St.3d 75, 79. A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. Russell v. Interim Personnel, Inc.
(1999), 135 Ohio App.3d 301, 304; Needham v. The Provident Bank
(1996), 110 Ohio App.3d 817, 826, citing Anderson v. Liberty Lobby,Inc. (1986), 477 U.S. 242, 248, 106 S.Ct. 2505.
 {¶ 24} Kobell contends in the first assignment of error that the trial court erred in applying New Jersey law to her claims in this case. A trial court's choice of law is subject to a de novo standard of review by this court. White v. Crown Equip. Corp., 160 Ohio App.3d 503,2005-Ohio-1785, at ¶ 7. Kobell argues that the laws of Ohio should govern her claims. We disagree.
 {¶ 25} Kobell asserted tort, contract and statutory claims in her complaint. Nevertheless, the parties and the trial court analyzed the choice of law question solely in the context of a tort action. In a tort action, it is presumed that the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit.Morgan v. Biro Mfg. Co., Inc. (1984), 15 Ohio St.3d 339, 342. To determine the state with the most significant relationship to a lawsuit, a trial court must consider: "(1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 [of 1 Restatement of the Law 2d, Conflict of Laws (1971) 10] which the court may deem relevant to the litigation." Id.; see, also Bertram v. Norden,159 Ohio App.3d 171, 2004-Ohio-6044, at ¶ 16.
 {¶ 26} In the case at bar, Kobell points to certain alleged facts that she claims establishes her relationship with TALX was centered in Ohio and not New Jersey. Kobell argues: (1) she was required to travel to Ohio as part of her employment with TALX; (2) TALX negotiated and made decisions that injured her in Ohio; (3) she reported to Hoyt, a resident of Ohio; (4) the closing of TALX's purchase of the UC unit took place in Ohio; (5) TALX offered her an employment agreement in Ohio; and, (6) Kobell was publicly humiliated and sexually harassed in Ohio.
 {¶ 27} Applying the Morgan factors to this case, we agree with the trial court that New Jersey has the most significant relationship to this case. Kobell lived and worked in New Jersey. Regardless of the label used, the main thrust of Kobell's claims is the injury to her employment. Therefore, the place of the injury, which is presumed to be the state with the most significant relationship, is New Jersey. Kobell fails to identify any alleged facts that are significant enough to overcome this presumption. Although some of the facts Kobell alleges indicate a relationship to Ohio, other facts mitigate in favor of New Jersey. For example, Canfield's alleged harassment of Kobell occurred in both New Jersey and Ohio. Although the sale of the UC unit occurred in Ohio, Kobell's claims are only indirectly related to the sale. Moreover, Canfield and TALX were based in Missouri, not Ohio. Because Kobell's claims primarily arise from her employment with the UC unit, and because she was employed in New Jersey, the trial court did not err when it chose to apply New Jersey law to her claims.
 {¶ 28} We reach the same conclusion even if we analyze the choice of law question in the context of a contract action. See Ohayon v. SafecoIns. Co. of Ill. (2001), 91 Ohio St.3d 474, 477; 1 Restatement of the Law2d, Conflict of Laws (1971) 575, Section 188. Kobell worked and resided in New Jersey. She did not negotiate with Canfield nor did she ever actually enter into a contract with him. New Jersey, therefore, has the most significant relationship to the transaction and the parties.
 {¶ 29} Appellants' first assignment of error is overruled.
 {¶ 30} In their second assignment of error, appellants contend the trial court erred when it ruled that there was not a fiduciary relationship between appellants and TALX. The term "fiduciary relationship" has been defined by the Supreme Court of Ohio as a relationship in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust. EdSchory Sons, Inc. v. Soc. Natl. Bank (1996), 75 Ohio St.3d 433, 442;In re Termination of Employment of Pratt (1974), 40 Ohio St.2d 107,115.[3]
Ordinarily, a business transaction where the parties deal at arm's length does not create a fiduciary relationship. RPM, Inc. v. Oatey Co.,
Medina App. No. 3282-M, 2005-Ohio-1280, at ¶ 19. A fiduciary relationship can be created by a formal agreement or may arise de facto from an informal relationship if both parties understand that a special trust or confidence has been reposed. Cairns v. Ohio Sav. Bank (1996),109 Ohio App.3d 644, 649, citing Umbaugh Pole Bldg. Co. v. Scott
(1979), 58 Ohio St.2d 282, syllabus.[4] The existence of a fiduciary relationship depends on the facts and circumstances in each case. Depaughv. Ohio Dept. of Commerce, Div. of Real Estate (1998),128 Ohio App.3d 528, 533; cf. Wakeman Oil Co., Inc. v. CitizensNatl. Bank of Norwalk (Sept. 13, 1996), Huron App. No. H-95-045 (finding no question of fact as to lack of fiduciary relationship); Lippy v. Soc.Natl. Bank (1995), 100 Ohio App.3d 37, 45 (question of fact raised regarding creation of fiduciary relationship).[5] The undisputed facts in this case establish that there was no fiduciary relationship between appellants and TALX.
 {¶ 31} Appellants contend that a fiduciary relationship was created informally between Canfield and Hoyt based upon their prior working relationship. A de facto fiduciary relationship may be created informally, for example, through the parties' interaction. This sort of fiduciary relationship can only be created where both parties understand that a special trust or confidence has been reposed. Eller Media Co. v.DGE, Ltd., Cuyahoga App. No. 83273, 2004-Ohio-4748, at ¶ 54 (informal, de facto fiduciary relationship cannot be unilateral). Appellants presented no evidence to indicate that Canfield intended to create such a relationship between himself and Hoyt, regardless of Hoyt's unilateral understanding of their relationship. Adorno v. Delgado, Lorain App. No. 04CA008436, 2004-Ohio-5559, at ¶ 11 (no de facto fiduciary relationship). There is no evidence that any special level of trust or confidence, over and above an ordinary arm's length business relationship, existed between Canfield and Hoyt. Therefore, as a matter of law, no informal fiduciary relationship could exist.
 {¶ 32} A fiduciary relationship may also be created by a formal agreement. Hoyt argues that a fiduciary relationship arose from the confidentiality agreement Canfield signed in August 2001 when Hoyt was attempting to purchase the UC unit himself. However, the confidentiality agreement Canfield signed did not establish any type of fiduciary relationship. In the agreement, Canfield acknowledged that Hoyt would share with Canfield a "potential opportunity" in a "possible business combination" to purchase the UC unit. Canfield agreed not to disclose any confidential information that Hoyt might share with him to further that goal. Nothing in the agreement suggests that the parties contemplated the creation of a fiduciary relationship. See RPM, Inc, supra at ¶ 21 (no fiduciary relationship arising from parties' confidentiality agreement). The fact that Hoyt felt the need to have Canfield sign a confidentiality agreement also supports the conclusion that the two did not have a fiduciary relationship because Hoyt obviously felt that a written confidentiality agreement was necessary to protect the information Hoyt shared with Canfield. Id. at ¶ 23.
 {¶ 33} Hoyt also argues that he and TALX entered into a joint venture to purchase the UC unit at the August 2001 meeting and, thus, assumed fiduciary obligations to each other. Again, we disagree. A joint venture is a contractual association in which the parties intend to carry out a common business purpose. Nilavar v. Osborn (1998), 127 Ohio App.3d 1,20. A joint venture does create a fiduciary relationship among the parties. Id.; Eynon v. Pullman Hoffman, Inc. (Dec. 16, 1996), Stark App. No. 96-CA-0109. However, Hoyt and Canfield did not enter into a joint venture to purchase the UC unit. Although Hoyt approached Canfield in August 2001 to discuss TALX's interest in becoming a minority investor in the purchase of the UC unit, Canfield rejected that opportunity. The confidentiality agreement Canfield signed did not create a joint venture to purchase the UC unit. It merely provided Hoyt with some protection for the information he provided Canfield so that the business opportunity could be evaluated. Ultimately, Hoyt abandoned his plan to purchase the UC unit and, thereafter, TALX purchased the UC unit without Hoyt's financial assistance. Because Hoyt and Canfield did not enter into a joint venture to purchase the UC unit, no fiduciary relationship could arise therefrom.
 {¶ 34} Given the absence of evidence indicating a fiduciary relationship by informal interaction or by express agreement, the trial court did not err when it found that no fiduciary relationship existed between Hoyt and Canfield. Appellants' second assignment of error is overruled.
 {¶ 35} In their third assignment of error, appellants' contend the trial court erred by granting summary judgment on their fraud claims against TALX. To prove fraud, a plaintiff must demonstrate the following elements: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and, (6) a resulting injury proximately caused by the reliance. Williams v. Aetna Fin. Co. (1998), 83 Ohio St.3d 464, 475;Martin v. Ohio State Univ. Found. (2000), 139 Ohio App.3d 89, 98.[6]
 {¶ 36} Generally, fraud cannot be predicated on a promise or representation concerning future actions or conduct. Id.; Yo-Can, Inc.v. The Yogurt Exchange, Inc., 149 Ohio App.3d 513, 2002-Ohio-5194, at ¶ 43.[7] Such representations are considered predictions and not fraudulent misrepresentations. Martin; Link v. Leadworks Corp. (1992),79 Ohio App.3d 735, 742. The exception to this rule is when the person "`who makes his promise of future action, occurrence, or conduct, and who at the time he makes it, has no intention of keeping his promise. In such case, the requisite misrepresentation of an existing fact is said to be found in the lie as to his existing mental attitude and present intent.'" (Emphasis sic.) Martin, quoting Tibbs v. Natl. HomesConstr. Corp. (1977), 52 Ohio App.2d 281, 287.[8]
 {¶ 37} Appellants allege in their complaint that Canfield fraudulently represented to them that if TALX purchased the UC unit, Hoyt would head up the new UC unit and Kobell would be the head of the unit's national sales and service operation.[9] Appellants claim that Canfield knew these representations were false because Canfield planned to acquire Frick and place its employees in the top positions. However, the timeline of events demonstrates that this claim is unsupportable.
 {¶ 38} Appellants allege that Canfield made his promises to them in discussions that occurred in April and August 2001. Canfield testified in his deposition that he did not begin discussions or negotiations to purchase Frick until October 2001 at the earliest, although other representatives of TALX may have met with Frick in September. Prior to September, Canfield had not identified any specific companies other than the UC unit. There is no evidence disputing these facts. If Canfield did not identify Frick as a possible acquisition until after he allegedly made his promises to appellants, Canfield could not have made the April and August statements with the present intention to replace appellants with Frick employees. Lacking at least some circumstantial evidence indicating that Canfield had no intention of keeping his promises, such statements cannot be a basis for a fraud claim. Gouge v. BAX Global,Inc. (N.D.Ohio 2003), 252 F.Supp.2d 509, 516. Accordingly, the trial court properly granted summary judgment in favor of TALX on appellants' fraud claims. Appellants' third assignment of error is overruled.
 {¶ 39} Appellants contend in their fourth assignment of error that the trial court erred when it granted TALX summary judgment on their breach of contract claims. Essentially, appellants claim that Canfield offered them a unilateral contract of employment in April and August 2001 when he represented to Hoyt that Hoyt and his team (which included Kobell) would "run" the UC unit if TALX acquired it. Appellants further contend that they accepted this offer by their performance of the offered terms. We disagree.
 {¶ 40} It is fundamental that the formation of a contract requires an offer, acceptance of the offer and consideration. Tersigni v. Gen. Tire,Inc. (1993), 91 Ohio App.3d 757, 760; SJA Assoc., Inc. v. Gilder,
Cuyahoga App. No. 80181, 2002-Ohio-3545, at ¶ 23. However, an offer must be specific enough to form the basis for a meeting of the minds.[10]
Here, the oral statements upon which appellants rely are not sufficiently specific or certain to form the basis for an employment contract. Clarkv. Herman-Thompson, Allen App. No. 1-98-79, 1999-Ohio-780, at ¶ 47 (alleged agreement utterly vague in its terms); Coyne v. Hodge Constr.,Inc., Medina App. No. 03CA0061-M, 2004-Ohio-727 (terms of contract must be definite and certain). The alleged offers did not include any reference to a specific position, salary, or any other term that would normally be associated with an offer of employment. The alleged offers were also contingent upon TALX completing the acquisition. Canfield's statements simply reflect his future plans if TALX was successful in acquiring the UC unit. Without a specific offer of employment, there can be no meeting of the minds, and therefore, no employment contract. Because Kobell's breach of contract claim is premised on the same statements, which were communicated to her through Hoyt, her claim also fails as a matter of law.
 {¶ 41} Moreover, even if Canfield's statements could be construed as an offer of employment, it is undisputed that these statements contained no assurances of job security or continued employment for any duration. Therefore, such an offer would, at best, be for at-will employment. It is well-established that representations "which do not specify a particular duration or term of employment are presumed to be terminable by either party at will for any reason not contrary to law." Moss v. ElectroalloysCorp., Lorain App. No. 02CA008111, 2003-Ohio-831, at ¶ 12, quotingAnders v. Specialty Chem. Resources, Inc. (1977), 121 Ohio App.3d 348
at 351.
 {¶ 42} Lastly, appellants point to a representation in a Gates internal publication which indicated that TALX planned to offer Gates "associates" employment in their current positions at their current salaries upon completion of the acquisition. Even if appellants could be considered "associates," which appears doubtful given their status as management employees, it is undisputed that TALX ultimately offered appellants written employment contracts for management positions at the same salary they had been earning at Gates. Appellants did not accept these offers of employment. Therefore, no employment contract was formed.
 {¶ 43} For these reasons, appellants' fourth assignment of error is overruled.
 {¶ 44} In their fifth assignment of error, appellants contend the trial court erred when it granted summary judgment for TALX on appellants' promissory estoppel claims. The doctrine of promissory estoppel requires the demonstration of the following elements: (1) a clear, unambiguous promise; (2) reliance upon the promise by the promisee; (3) reasonable and foreseeable reliance; and, (4) the person claiming reliance is injured as a result of the reliance. Weiper v. W.A.Hill Assoc. (1995), 104 Ohio App.3d 250, 260.[11] The first and third elements are primarily at issue here.
 {¶ 45} With respect to the first element, Canfield's statements that Hoyt and Hoyt's team would "run" the UC unit if TALX acquired it are not specific and certain enough to support a claim of promissory estoppel in the employment context. Courts do not allow vague assurances of job security or future employment to serve as the basis for promissory estoppel. Gouge, supra, at 519-520; Daup v. Tower Cellular, Inc. (2000),136 Ohio App.3d 555, 563; Scanlon v. Tremco, Inc. (Dec. 3, 1998), Cuygahoa App. No. 73808. Again, Canfield's statements include no reference to duration, salary, or any other employment term. A promise of continued employment must be for a specific term in order to establish a prima facie claim of promissory estoppel. Pupillo v. St. Vincent CharityHosp. (Sept. 13, 2001), Cuyahoga App. No. 79062; McCullough v. Avon LakeMcDonald's (Aug. 16, 1995), Lorain App. No. 95CA006066. Canfield's statements do not meet this standard. Even if we were to construe Canfield's statements as an offer of employment, rather than simply as an expression of his plan, any employment relationship arising therefrom would be "at will." A promise of future benefits or opportunities must contain a specific promise of continued employment in order to merit a promissory estoppel exception to the employment at-will doctrine. Wing v.Anchor Media Ltd. of Texas (1991), 59 Ohio St.3d 108, 110; Boggs v. TheScotts Co., Franklin App. No. 04AP-425, 2005-Ohio-1264, at ¶ 28. Because there is no evidence of a clear, unambiguous promise of continued employment, appellants cannot establish the first element of a promissory estoppel claim.
 {¶ 46} Nor could appellants reasonably rely on Canfield's statements. Appellants were well aware at the time Canfield made these statements that TALX was in the early stages of an attempted acquisition of the UC unit. In fact, the acquisition was not completed until approximately seven months after these statements were made. Appellants could not reasonably rely on these general statements when the acquisition was far from certain. Gouge, supra, (plaintiff could not justifiably rely on a specific promise of continued employment at an as-yet uncertified airline). Accordingly, appellants' claim for promissory estoppel fails as a matter of law and appellants' fifth assignment of error is overruled.
 {¶ 47} In their sixth assignment of error, appellants contend the trial court erred when it granted summary judgment on their claims for unjust enrichment. Unjust enrichment occurs when a party retains money or benefits which, in justice and equity, belong to another. Hummel v.Hummel (1938), 133 Ohio St. 520, 528; Liberty Mut. Ins. Co. v. Indus.Comm. (1988), 40 Ohio St.3d 109, 110-111. A claim for unjust enrichment rests upon the equitable principle that one shall not be permitted to unjustly enrich oneself at the expense of another without making compensation therefor. National City Bank v. Fleming (1981),2 Ohio App.3d 50, 57. In order to prove unjust enrichment, a plaintiff must establish a benefit conferred by the plaintiff upon a defendant, the defendant's knowledge of the benefit, and the defendant's retention of the benefit under circumstances where it would be unjust to do so without payment. Hambleton v. R.G. Barry Corp. (1984),12 Ohio St.3d 179, 183.[12] Unjust enrichment involves not only a loss by the plaintiff, but also the defendant must receive a gain. NationwideIns. Enterprise v. Progressive Specialty Ins. Co., Franklin App. No. 01AP-1223, 2002-Ohio-3070, at ¶ 31.
 {¶ 48} Appellants claim in their complaint that TALX unjustly benefited from their information, assistance and cooperation during TALX's acquisition of the UC unit. The trial court found that appellants' unjust enrichment claims failed because their efforts to sell the UC unit were undertaken on behalf of Gates — not TALX. We agree.
 {¶ 49} When Nationwide decided to sell the UC unit, Hoyt and Kobell agreed to assist with the sale. Between that time and the sale of the UC unit to TALX, Hoyt and Kobell were employed by Gates and acted on behalf of Gates and Nationwide to help sell the UC unit. Appellants both testified that they assisted TALX with the acquisition in the same manner they would have assisted any purchaser because they were obligated to Gates to use their best efforts to sell the unit. Appellants were compensated for their performance of those duties.[13] Appellants' efforts to promote the sale of the UC unit were taken in furtherance of their employers' goals. Thus, Nationwide and Gates received the benefits from appellants' actions and those actions cannot be the basis for an unjust enrichment claim against TALX.
 {¶ 50} Appellants also contend that Hoyt conferred a benefit on TALX by abandoning his plan to purchase the UC unit himself after Canfield stated to him that Hoyt would run the UC unit if TALX acquired it. However, there is no evidence that Hoyt had the ability to purchase the UC unit even if he had proceeded with his original plan. He failed to raise enough money on his own to buy the unit and Nationwide had rejected his one offer. Although Hoyt had some possible interest from a venture capitalist, he never pursued that source of capital. It is pure speculation to say that Hoyt could have raised the additional money needed to purchase the UC unit. Moreover, Hoyt testified that he abandoned his plan to purchase the unit for a number of reasons, including the financial and personal risks associated with the purchase. Hoyt abandoned his plan because he perceived it was in his self-interest to do so — not because he intended to confer a benefit to TALX.
 {¶ 51} Because appellants did not confer any benefits to TALX, appellants cannot prevail on their unjust enrichment claim. Appellants' sixth assignment of error is overruled.
 {¶ 52} Appellants next contend, in their seventh assignment of error, that TALX violated public policy when it retaliated against them for retaining legal counsel. Specifically, appellants claim that Canfield withdrew the employment offers after they informed Canfield that they had hired legal counsel. The trial court determined that appellants' public policy claims failed because, among other reasons, appellants were not TALX employees when their offers were withdrawn. Again, we agree.
 {¶ 53} The Supreme Court of Ohio has created a cause of action for an at-will employee who has been terminated in contravention of a clear public policy. Greely v. Miami Valley Maintenance Contrs., Inc. (1990),49 Ohio St.3d 228, 233-234.[14] To state a Greely claim for wrongful termination in violation of public policy in Ohio, a plaintiff must satisfy the following elements: (1) a clear public policy existed and was manifested in the federal or state constitution, statute, administrative regulation, or common law; (2) terminating employees under circumstances such as those involved in the plaintiff's termination would jeopardize the public policy; (3) plaintiff's dismissal was motivated by conduct related to the public policy; and, (4) the employer lacked overriding legitimate business justification for the dismissal. Collins v. Rizkana
(1995), 73 Ohio St.3d 65, 69-70; Mitchell v. Mid-Ohio EmergencyServices, L.L.C., Franklin App. No. 03AP-981, 2004-Ohio-5264, at ¶ 16. The first two prongs are questions of law for the court while the latter two prongs are questions for the trier of fact. Id.
 {¶ 54} The basis of appellants' wrongful termination claim is that TALX withdrew their offers of employment in retaliation for hiring counsel. Canfield gave appellants written offers of employment in March 2002. Neither appellant signed the offer of employment and they both became disgruntled because of their projected role with TALX. As a result, in early May 2002, both Hoyt and Kobell (through her lawyer) wrote letters to Canfield in which they expressed their belief that Canfield had broken his promises to them. They both proposed a settlement agreement which included lump sum cash payments as well as consulting agreements. Canfield withdrew the offers of employment because he surmised from appellants' letters that they had no desire to work for TALX. Significantly, appellants were still Nationwide employees at the time Canfield withdrew the offers of employment.
 {¶ 55} Appellants cannot assert a Greely wrongful termination claim against TALX because they were not TALX at-will employees when the alleged adverse employment action occurred. It is not disputed that appellants remained Nationwide employees until June 26, 2002. It is also undisputed that Canfield withdrew appellants' employment offers in May 2002. Therefore, there was no employment relationship between TALX and appellants when their offers were withdrawn. Greely claims are limited to at-will employees. Haynes v. Zoological Soc. of Cincinnati (1995),73 Ohio St.3d 254, 256. Appellants cannot establish a Greely claim when there is no existing employee at-will relationship. Cf. Valot v.Southeast Local School Dist. Bd. of Edn. (1997), 124 Ohio App.3d 492,497 (finding Greely inapplicable where plaintiffs were not at-will employees of defendant).[15] The fact that TALX ultimately paid appellants for one day's work as required by the purchase agreement is irrelevant.
 {¶ 56} Because appellants were not at-will employees of TALX when the offers of employment were withdrawn, they cannot prevail on a Greely
public policy wrongful termination claim. Therefore, appellants' seventh assignment of error is overruled.
 {¶ 57} Hoyt contends in the eighth assignment of error that the trial court erred when it granted TALX summary judgment on his age discrimination claim. Hoyt brought this claim under R.C. Chapter 4112. We note that federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases alleging violations of R.C. Chapter 4112. Plumbers Steamfitters Commt. v. Ohio Civil Rights Comm.
(1981), 66 Ohio St.2d 192, 196.
 {¶ 58} Under Ohio law, a prima facie case of age discrimination may be proved either directly or indirectly. An employee "may establish a prima facie case of age discrimination directly by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent." Mauzy v. Kelly Services, Inc. (1996),75 Ohio St.3d 578, paragraph one of the syllabus; Smith v. E.G. Baldwin Assoc., Inc. (1997), 119 Ohio App.3d 410, 415. If, however, the employee is unable to establish a causal link or nexus between the employer's discriminatory statements or conduct and the act that allegedly violated the employee's rights under the statute, then the employee has not proved age discrimination by the direct method of proof. See Byrnes v. LCI Communication Holdings Co. (1996),77 Ohio St.3d 125, cert. denied (1997), 521 U.S. 1104, 117 S.Ct. 2480. Without direct proof of discrimination, an employee may establish a prima facie claim of age discrimination indirectly by demonstrating that he or she (1) was a member of the statutorily protected class, (2) was discharged, (3) was qualified for the position, and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age. Coryell v. Bank One Trust Co., N.A., 101 Ohio St.3d 175,2004-Ohio-723, at ¶ 20.
 {¶ 59} Once an employee establishes a prima facie case of age discrimination, the burden shifts to the employer to provide some legitimate, nondiscriminatory reason for the action taken. Kohmescher v.Kroger Co. (1991), 61 Ohio St.3d 501, 503. If the employer establishes a nondiscriminatory reason, the employee then bears the burden of showing that the employer's proffered reason was a pretext for impermissible discrimination. Owens v. Boulevard Motel Corp. (Nov. 5, 1998), Franklin App. No. 97APE12-1728; Cruz v. South Dayton Urological Associates, Inc.
(1997), 121 Ohio App.3d 655, 659. The employee must prove that the employer's nondiscriminatory reason was false and that discrimination was the real reason for the action taken. Wagner v. Allied Steel TractorCo. (1995), 105 Ohio App.3d 611, 617. Mere conjecture that the employer's proffered reason is pretext is insufficient to withstand a summary judgment motion. Surry v. Cuyahoga Community College,149 Ohio App.3d 528, 2002-Ohio-5356, at ¶ 24. To avoid summary judgment, plaintiff must produce some evidence that the defendant's proffered reasons were factually untrue. Id.
 {¶ 60} Hoyt was born in April 1939. That would make him almost 63 years old when TALX purchased the UC unit. As direct evidence of TALX's discriminatory animus toward him, Hoyt points to a comment Canfield allegedly made about potentially hiring a woman in her 60's. According to Hoyt, Canfield stated that he would not want to hire someone in their 60's but would rather put them on a consulting agreement. Hoyt claims that this comment, coupled with Canfield's later consideration of a consulting arrangement with Hoyt, is direct evidence that Canfield's actions were motivated by discriminatory intent. We disagree.
 {¶ 61} While age related comments directed toward the employee may support an inference of age discrimination, isolated, ambiguous, or abstract comments cannot support a finding of age discrimination.Robinson v. Nationwide Mut. Ins. Co. (Dec. 21, 2001), Lake App. No. 2000-L-119; Wilson v. Precision Environmental Co., Cuyahoga App. No. 81932, 2003-Ohio-2873, at ¶ 25. Canfield's isolated comment about another potential employee does not constitute direct evidence of his intent to discriminate against Hoyt. In fact, Canfield gave Hoyt a written employment agreement in which he offered him an executive position for two years. Hoyt did not sign that agreement. The possibility of a consulting agreement with Hoyt did not arise until after Hoyt expressed a desire for an exit strategy. There is no evidence linking Canfield's comment about entering into a consulting agreement with another older worker with his conduct towards to Hoyt. Absent that link, Hoyt failed to present a prima facie case of age discrimination with direct evidence. Byrnes, supra, at 129.
 {¶ 62} In regards to Hoyt's attempt to provide indirect evidence of discrimination, TALX does not dispute the first three elements of a prima facie case of indirect age discrimination. Hoyt was almost 63 years old when TALX acquired the UC unit. Therefore, he was a member of a statutorily protected class. TALX does not dispute Hoyt's qualification for the position. Lastly, Canfield's refusal to allow Hoyt to run the new business entity was arguably an adverse employment action. The trial court determined, however, that Hoyt could not show that he was replaced by a person substantially younger. We agree.
 {¶ 63} Canfield testified in an affidavit that he decided to run the new business entity himself and that he did so for a year after TALX purchased the UC unit. Canfield is the same age as Hoyt. Because Canfield, Hoyt's immediate replacement, was not substantially younger than Hoyt, he cannot meet the fourth element of the prima facie case of an indirect age discrimination claim. McCarthy v. New York City TechnicalCollege (S.D.N.Y. 1997), No. 93 Civ. 7438.
 {¶ 64} In an attempt to show that he was replaced by a substantially younger employee, Hoyt points to Hoffman, age 44, who was promoted to head up the UC unit one year later. In some cases, circumstances may warrant an inference of discriminatory intent even when an employee is replaced by someone who is older, such as when the older employee is quickly replaced by a substantially younger employee. See e.g., Greenev. Safeway Stores, Inc. (C.A.10, 1996), 98 F.3d 554, 561. However,Greene involved a claim of direct age discrimination. Hoyt raises Hoffman's age in the context of an indirect age discrimination claim. It is questionable whether the Greene reasoning would be applicable to an indirect age discrimination claim. See Gutknecht v. SmithKline BeechamClinical Labs., Inc. (E.D.Pa., 1996), 950 F.Supp. 667, fn. 5 (noting that Greene did not deal with prima facie test for claim of indirect discrimination).
 {¶ 65} Even if we applied Greene to Hoyt's indirect age discrimination claim, there still must be some other evidence to support the inference that an older worker was employed only temporarily as a shield against an age discrimination claim. In Greene, such evidence included a pattern of age based removals, comments made to the employee, and witnesses who expressed surprise at the hire of the older worker because that worker was going to retire. See, also, id. (finding no evidence to suggest temporary hire of older employee was anything other than a prudent business decision). The undisputed facts in this case do not warrant an inference of discriminatory intent. Canfield decided to run the business because he wanted to facilitate the integration of the UC unit and Frick. Canfield held that position for a year. See id. (not sufficient circumstances to show inference where older employee held position for a year and three months). Canfield then promoted Hoffman due to Hoffman's success in achieving the company's objectives and because Hoffman had more experience than any other TALX executive still with the company. Hoyt does not present any evidence to indicate that Canfield ran the new business entity himself in order to shield TALX from a claim of age discrimination. McCarthy v. New York City Technical College of CityUniversity of New York (C.A.2, 2000), 202 F.3d 161, 165 (noting that the mere fact that replacement left after a brief employment gives "little support to the inference that his employment was a subterfuge to disguise age discrimination."). Therefore, the subsequent promotion of Hoffman a year later is not significant.
 {¶ 66} Even if Hoyt had demonstrated a prima facie case of age discrimination, directly or indirectly, the burden then shifted to TALX to present a legitimate, non-discriminatory reason for the action it took. TALX met this burden when it identified a legitimate, non-discriminatory reason for its actions — Canfield's desire to facilitate the integration of the two new business entities. A year later, in April 2003, Canfield promoted Hoffmann to lead the new UC unit due to Hoffman's success and aggressiveness in completing his objectives with the company and his experience in the business. These are legitimate, non-discriminatory reasons for TALX's actions.
 {¶ 67} Because TALX provided legitimate, non-discriminatory reasons for its actions, the burden then shifted to Hoyt to show that TALX's non-discriminatory reason was false and that discrimination was the real reason for its action. To defeat a motion for summary judgment, Hoyt must point to some evidence from which a reasonable factfinder could reasonably: (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions. Fuentes v. Perskie (C.A.3, 1994), 32 F.3d 759, 764. Hoyt fails completely in this regard. The only evidence Hoyt presented to demonstrate that TALX's reasons were pretext is the fact that a younger person ultimately replaced him as the head of the UC unit. However, the mere fact that a younger person ultimately replaced Hoyt, standing alone, does not show that TALX's legitimate, non-discriminatory reason was false or that TALX's real reason for its action was discriminatory. See Wilson v. Precision Environmental Co., Cuyahoga App. No. 81932, 2003-Ohio-2873, at ¶ 39 (mere fact that younger employees retained does not establish pretext); Cousins v. Howell Corp. (D.Conn. 2000),113 F.Supp.2d 262, 269 (noting that replacement of an older worker with a younger worker does not itself prove unlawful discrimination). Because Hoyt failed to present any other evidence of pretext, TALX was entitled to summary judgment on Hoyt's age discrimination claim.
 {¶ 68} Hoyt also contends that TALX subjected him to a hostile work environment. A prima facie case of hostile work environment is established by showing that the employee (1) was a member of a protected class, (2) was subjected to unwelcome harassment because of age, (3) that had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile or offensive work environment. Surry, at ¶ 37; cf. Sheffield Village v. Ohio CivilRights Comm. (June 7, 2000), Lorain App. No. 99CA007283 (sex discrimination); Cincinnati Bar Assoc. v. Young (2000), 89 Ohio St.3d 306,315-316 (sex discrimination). Whether a work environment is a hostile environment is a question of fact. Peterson v. Buckeye Steel Casings
(1999), 133 Ohio App.3d 715, 724.
 {¶ 69} Conduct that is merely offensive is not actionable as hostile work environment. Harris v. Forklift Systems, Inc. (1993), 510 U.S. 17, 21,114 S.Ct. 367, 370. A hostile work environment exists "`[w]hen the workplace is permeated with `discriminatory intimidation, ridicule, and insult, * * * sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Id., quoting Meritor Savings Bank, FSB v. Vinson (1986), 477 U.S. 57,106 S.Ct. 2399. The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the employee must subjectively perceive the environment as hostile or abusive. Id. Whether an environment is hostile or abusive must be determined by looking at all the circumstances. While no single factor is required, circumstances to consider may include the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely an offensive utterance, whether the conduct unreasonably interferes with an employee's work performance, and whether psychological harm results. Starner v. Guardian Industries
(2001), 143 Ohio App.3d 461, 476.
 {¶ 70} Hoyt's claim of a hostile work environment is based on: (1) Canfield's refusal to offer him the head of the new UC unit or any other specific position; (2) Canfield's request that Hoyt arrange a meeting to which Hoyt was not invited to attend; (3) Canfield's request that Hoyt receive carbon copies along with his own secretary; and, (4) Canfield's instructions to TALX's employees to limit contact with Hoyt.
 {¶ 71} We first note that Hoyt was not employed by TALX at the time of these incidents. A plaintiff must be an employee at the time of the harassment to establish a claim for hostile work environment. Kinnisonv. Advance Stores Co., Inc., Richland App. No. 02CA73, 2003-Ohio-3387, at ¶ 16-17, citing Moore v. Pennsylvania Dept. of Military VeteransAffairs (E.D.Pa., 2002), 216 F.Supp.2d 446. Even if Hoyt could bring this claim, this conduct, considering the factors set forth above, is not sufficiently severe or pervasive to create an hostile working environment. Assuming all of his allegations as true, Hoyt does not present any evidence to indicate that he felt that this conduct unreasonably interfered with his employment. Simply put, Hoyt failed to present any evidence to show a genuine issue of material fact that his work environment was so permeated with discriminatory intimidation, ridicule, and insult that it constituted a hostile work environment. Nor did he allege that any of this conduct occurred because of his age. Cf.Bennett v. Roadway Express, Inc. (Aug. 1, 2001), Summit App. No. 20317 (finding no hostile work environment where plaintiff did not show treatment based on sex). Hoyt's bruised ego over these perceived slights is insufficient to constitute a hostile work environment. Cf. Madera v.Satellite Shelters, Inc. (Aug. 12, 1998), Cuyahoga App. No. 73172 (no hostile work environment where remarks made by person in authority, while offensive, did not unreasonably interfere with plaintiff's work).
 {¶ 72} Because there is no genuine issue of fact regarding Hoyt's age discrimination and hostile work environment claims, and because TALX is entitled to judgment as a matter of law, the trial court properly granted TALX summary judgment on these claims. Appellants' eighth assignment of error is overruled.
 {¶ 73} In the ninth assignment of error, Kobell contends the trial court erred when it granted summary judgment on her sex discrimination claim. Kobell brought this claim under R.C. 4112.02(A). We have already determined, however, that to the extent this is a tort action, New Jersey's law applies because that state has the most significant relationship to the case. In this context, an employment discrimination claim is a cause of action sounding in tort. Reilly v. Alcan AluminumCorp. (C.A.6, 1999), 181 F.3d 103. Therefore, because New Jersey law applies, Kobell could not assert an employment discrimination claim based on Ohio law. Id. Therefore, the trial court properly granted TALX summary judgment on her sex discrimination claim brought pursuant to Ohio law.
 {¶ 74} Even assuming Kobell could bring a sex discrimination claim under Ohio law, TALX would still be entitled to summary judgment. R.C.4112.02(A) prohibits an employer from engaging in sexual discrimination against an employee. Sexual harassment that constitutes discrimination on the basis of sex for purposes of R.C. 4112.02 is generally categorized as either a quid pro quo claim or a hostile work environment claim.Brentlinger v. Highlights for Childern (2001), 142 Ohio App.3d 25, 32. Quid pro quo harassment is directly linked to the grant or denial of a tangible economic benefit. Hampel v. Food Ingredients Specialties, Inc.
(2000), 89 Ohio St.3d 169, 176. It occurs where the employee's submission to or rejection of unwelcome sexual conduct is used as the basis for promotion or other employment decisions. Western-Southern Life Ins. Co.v. Fridley (1990), 69 Ohio App.3d 190, 194. To prevail on a quid pro quo claim of sexual harassment, Kobell must demonstrate (1) that the employee was a member of a protected class, (2) that the employee was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors, (3) that the harassment complained of was based on gender, and (4) that the employee's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment. Schmitz v. Bob EvansFarms, Inc. (1997), 120 Ohio App.3d 264, 269; Harmon v. BelcanEngineering Group (1997), 119 Ohio App.3d 435, 437.
 {¶ 75} In order to establish a claim of hostile work environment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. Hampel, supra; Chamberlinv. The Buick Youngstown Co., Mahoning App. No. 02-CA-115, 2003-Ohio-3486, at ¶ 34.
 {¶ 76} As in the age context, conduct that is merely offensive is not actionable as hostile work environment. A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, * * * sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, supra, at 21. The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the employee must subjectively perceive the environment as hostile or abusive. Id. Whether an environment is hostile or abusive must be determined by looking at all the circumstances. While no single factor is required, circumstances to consider may include the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely an offensive utterance, whether the conduct unreasonably interferes with an employee's work performance, and whether psychological harm results. Starner, supra, at 476; Chamberlin, supra, at ¶ 37.
 {¶ 77} Kobell bases her sex harassment claim on the following events: (1) Canfield kissed her on the lips at a public business dinner on March 27, 2002; (2) Canfield commented that Kobell did not wear a wedding ring and asked her about herself; (3) Canfield asked Kobell to sit next to him at a dinner; (4) Canfield repeatedly stated that he would like to come to New York to get to know her better; and, (5) Canfield called her several times to discuss small, unimportant business matters. Kobell claims that she did not respond to any of Canfield's advances and was immediately subjected to negative employment actions as a result.
 {¶ 78} Kobell's quid pro quo harassment claim fails for two reasons. First, she must show that Canfield made sexual advances or requests for sexual favors. The incidents of which Kobell complains are not sexual in nature and cannot be construed as requests for sexual favors. Kobell testified in her deposition that Canfield did not say anything inappropriate to her when he called her, nor did he ever proposition her. He never made any sexual innuendo with her and never asked her out on a social date. There is no evidence to indicate that Canfield's actions were sexual in nature or requests for sexual favors. See Ciliottav. Merrill Lynch (1997), 121 Ohio App.3d 324, 328.
 {¶ 79} Additionally, Kobell failed to present any evidence demonstrating that her submission to Canfield's requests was an express or implied condition of employment with TALX or that her refusal to submit to his requests resulted in a tangible job detriment. Assuming that Canfield's actions could be interpreted as sexual in nature, Kobell never stated that she felt she had to accept his requests in order to have an employment opportunity with TALX. Nor did Canfield ever expressly or implicitly make submission to his requests a condition of her employment. See Weiss v. Target Stamped Products, Trumbull App. No. 2003-T-0108, 2004-Ohio-7226, at ¶ 29. While Kobell's projected responsibilities with TALX were ultimately diminished from what she thought they would be, Kobell provides no evidence to demonstrate the causal link necessary to prove quid pro quo harassment. See King v. EnronCapital Trade Res. Corp. (Apr. 5, 2001), Franklin App. No. 00AP-761 (quid pro quo harassment requires demonstrable nexus between offensive conduct and adverse employment action).
 {¶ 80} With respect to Kobell's hostile work environment claim, we note that Kobell was not a TALX employee at the time these incidents occurred. Again, a claim for hostile work environment requires that the plaintiff be an employee when the allegedly hostile harassment occurs.Kinnison, supra. Because Kobell was not a TALX employee, she cannot state a claim for hostile work environment. Moreover, her allegations simply do not rise to the level of severe and pervasive conduct necessary to support such a claim. Accepting all of Kobell's allegations as true, Canfield's actions are not severe enough to create a workplace so permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Harris;Chamberlin, supra, at ¶ 43. Accordingly, the trial court properly granted TALX summary judgment on Kobell's sex discrimination claim, and appellants' ninth assignment of error is overruled.
 {¶ 81} Having overruled appellants' nine assignments of error, the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
French and McGrath, JJ., concur.
[1] The UC unit was technically acquired by Garcia Acquisition Sub., Inc., now known as TALX UCM Services, Inc., an entity created by TALX to receive the UC unit's assets. The purchase price included $3,250,000 for the UC unit's accounts receivables.
[2] Appellants subsequently dismissed their claims against Nationwide and Gates, with prejudice. Therefore, this appeal involves only appellants' claims against TALX.
[3] New Jersey law is similar. See F.G. v. MacDonell (N.J. 1997),696 A.2d 697, 703-704 (defining essence of fiduciary relationship as the trust and confidence placed in another who is in a dominant or superior position).
[4] Again, New Jersey law is similar in this regard. See Avon Bros.,Inc. v. Tom Martin Constr. Co., Inc. (N.J.Super.Ct.App.Div. 2000), No. A-740-99T1.
[5] New Jersey law is similar. See Id. (finding no material issue of fact as to fiduciary relationship).
[6] New Jersey law is similar. See Gennari v. Weichert Co. Relators
(N.J. 1997), 691 A.2d 350, 367.
[7] Again, New Jersey law is similar. See, id. (elements of fraud claim require misrepresentation of present or past fact).
[8] New Jersey law is similar. See Bell Atlantic Network Services,Inc. v. P.M. Video Corp. (N.J. 1999), 730 A.2d 406, 417.
[9] Appellants alleged in their summary judgment motion and on appeal that TALX also breached its fiduciary duties of good faith, loyalty and disclosure by inducing Hoyt to forgo the purchase of the UC unit and by failing to disclose that it was also negotiating to purchase Frick. However, these grounds for their fraud claims were not alleged in their complaint and, more importantly, we have already held that there was no fiduciary relationship between the parties. Therefore, TALX did not owe fiduciary duties to appellants and could not have breached any such duties.
[10] New Jersey law is similar. See Cleef v. P. Serelis Corp.
(N.J.Super.Ch., Apr. 8, 2005), No. WRN-C-16005-05.
[11] New Jersey law is similar. Pop's Cones, Inc. v. ResortsInternatl. Hotel, Inc. (N.J. 1998), 704 A.2d 1321, 1324.
[12] Again, New Jersey law is similar, although it does seem to disregard the defendant's knowledge of the benefit conferred, an issue not relevant in the instant matter. Associates Commercial Corp. v.Wallia (N.J. 1986), 511 A.2d 709, 716.
[13] Appellants' reliance on this court's decision in Quesnell v. BankOne Corp. (Apr. 4, 2002), Franklin App. No. 01AP-792, for the proposition that unjust enrichment is not barred when an employee is paid for the services he or she provided, is misplaced. In Quesnell, this court was presented with an employee who sued her employer for unjust enrichment, claiming that she was not adequately compensated for the work she performed for her employer. This case is factually distinguishable, as here, the employees (Hoyt and Kobell) are not suing their employer for work they performed on its behalf and were not adequately compensated for. Rather, they are suing a third-party for work they performed on behalf of their employer. Quesnell did not address the factual pattern of an employee suing a third-party for services the employee provided for its employer, as appellants are herein, and is therefore inapplicable.
[14] New Jersey recognizes a similar cause of action. Pierce v. OrthoPharm. Corp. (N.J. 1980), 417 A.2d 505, 512; Hampton v. Armand Corp.
(N.J. 2003), 834 A.2d 1077, 1080.
[15] New Jersey law is similar. See MacDougall v. Weichert (N.J. 1996), 677 A.2d 162, 165-166 (only em-ployee may raise wrongful discharge claim).